The State v. Harrod.

THE STATE v. HARROD, *Appellant.*

DIVISION TWO.

1  **Criminal Law**: MURDER: EVIDENCE: THREATS OF DEFENDANT. Evidence of threats made by the defendant against the deceased are admissible in evidence on behalf of the state on a trial for murder.

2. ———: ———: ———: THREATS OF DECEASED. Where the deceased is the aggressor threats by him against the defendant made recently before the homicide are material as characterizing the conduct of the deceased and to explain his intention in making the assault.

3. **Criminal Law**: HOMICIDE: DECEASED AS AGGRESSOR : INSTRUCTIONS. Where the evidence shows that the deceased was the aggressor in the difficulty which resulted in his death, it is error to instruct the jury on the hypothesis that the defendant brought on the difficulty.

4. ———: ———: SELF-DEFENSE : PROTECTION OF FATHER BY SON. The evidence showed that the deceased made a violent and unprovoked assault on defendant on the day preceding the homicide ;

that deceased was a man forty years of age and weighing one hundred and eighty to two hundred pounds, and six feet tall; that he held in his hand an iron chain about six feet long; that he was very angry; that defendant was a man sixty-five years old and suffering from heart disease; that deceased had gone out of his way to renew the quarrel of the previous day and had begun the affray by knocking down a son of defendant and had advanced with drawn chain to within six or seven feet of the defendant when he was struck with an axe in the hands of another son of the defendant and killed. *Held* that the right of self-defense became at that moment complete in the defendant and whatever right the defendant had the son also had for the protection of his father.

5. —— : —— : SELF-DEFENSE. Where self-defense is relied on as a defense it is not necessary that the defendant should be in actual danger; it is sufficient if there was reasonable ground for defendant to believe such danger was real and imminent.

*Appeal from Nodaway Circuit Court.*—Hon. C. A. ANTHONY, Judge.

REVERSED AND REMANDED.

AT the March term, 1890, of the circuit court of Gentry county, the defendant, Selus Harrod and his two sons, John J. Harrod and Selus Preston Harrod, were indicted for murder in the first degree of Barnett Harrod Fallis, on the twenty-sixth day of December, 1889. At the same term on their joint application a change of venue was granted them to the circuit court of Nodaway county.

At the June term of the Nodaway court a severance was granted Selus Harrod, and he was separately tried at said term. He was convicted of murder in the second degree and sentenced to ten years' imprisonment in the penitentiary, From this sentence he appeals to this court.

The evidence develops this state of facts: The defendant had leased to the deceased, Barnett Fallis, certain lands for that season and Fallis was occupying a tenant house with a small inclosure around it on the Harrod farm, detached, however, from the lands he was

cultivating. This farm was about two and one-half miles northwest of the town of McFall in Gentry county. The house in which Fallis was living was situated about one hundred and seventy-five feet north of a public road running east and west along the south side of the Harrod farm. Selus *Preston* Harrod, the son of defendant, lived about half a mile east of the place where Fallis, the deceased, lived. The father, Selus Harrod, lived in the town of McFall and his son, John Harrod, made his home with him. The tenant house in which Fallis was living was surrounded by timber, to the north and east. The stable and cowpens to the Fallis lot were about two hundred yards north of the house, and there were two ponds between the house and stable. Just south of the house, there was a gate opening into the public road. From this gate, there were two farm roads or paths, one leading around east and north of the Fallis residence and the other, to the west through the timber, to a point near the pond southwest of the stable and to a fence, dividing a cornfield from the woods pasture and meadow on the east and north.

The tragedy, resulting in the death of Fallis, occurred on the farm of defendant, on the road running to the east and north of the Fallis residence, about one hundred yards north of the house, one hundred yards southeast of the barn and seventy-five yards from the north pond. This private road runs between the two ponds and just between the two it branches, one fork to the north to the stable ; the other fork going to a gate in the fence west of the north pond. West of the cornfield was a meadow with a number of haystacks in it. This meadow came down to the road on the south of the farm. It appears that, in this wood pasture and meadow around the Fallis residence, the defendant had some forty cattle and six or seven horses. He had the exclusive possession of all the farm except the house and stable.

The evidence shows that in July, 1889, the deceased, Fallis, and the defendant and defendant's sons had an altercation, which resulted in nothing but hot words. On the twenty-fifth of December, 1889, the defendant took a sack of salt and went to his farm on which Fallis was living, to salt his cattle and to invite his son Preston and family to take dinner with him. After salting the cattle, he started for his home in the village of McFall. He had reached the gate just south of Fallis' house, leading into the public road, when Fallis came to him and took hold of him and demanded a settlement. Fallis was forty years old and weighed about one hundred and eighty pounds. The defendant was sixty-five years old and a smaller man.

Emmett Fallis, a son of deceased, a boy eleven years old, testified as to this occurrence at the gate. He says: "The day before the homicide, I saw Selus Harrod at our front gate. My father and I were going east on the road. Mr. Harrod, the defendant, had nothing in his hand but some salt. When he opened the gate, we were pretty close to him. The first thing that was said, Pa asked him if he was *willing to settle.* Don't remember well what occurred. Pa asked him again and said, 'if you will just pay me $50 I will give possession in ten days.' Harrod 'hollered' for Mr. Claycomb, who lived on the place just south. Harrod told Pa to let him alone and Pa told him he would if he would settle. Defendant *'hollered' as loud as he could* for Pa to let him alone. Pa told him to hush, that he needn't halloo for Claycomb; that he wasn't going to hurt him if he would settle. When he started home Pa *hunched him* with his knee a little."

Defendant's version of this matter is: "He, Fallis, took hold of me. 'Now,' he says, 'I'll tell you what it is, damn you, you and Pres. have got to lay me down a flat $100 or I'll burn you out smack smooth.' He jammed me back against the fence and jerked me

forward. I was worried. I 'hollered' for Claycomb. I said, 'Barnett, you know very well you have the advantage of me, a big, stout young man.' Then he jerked me and told me to hush, and I 'hollered' for Claycomb three or four times. He said, 'G–d damn you, if you don't hush, I will kill you.' I got loose and started to my wagon. He followed, and kicked me."

For this assault, defendant caused Fallis to be arrested. On the next day, the defendant and his son, John Harrod, took a team and went from McFall, northwest to the residence of Selus Preston Harrod. John and the defendant both testify their purpose was to fence their hay from the cattle. When they reached Preston's house, they stopped. The sons took off the wagon bed. The old man, the defendant, went on to the farm where Fallis lived, to see about his cattle. He went in the gate in front of Fallis' house, took the path to the left of the house and went up to the ponds, near the stable. There he scattered out some salt and laid some rails on the fence between the cornfield and woods pasture. While alone there, Fallis passed and went up to the stable and got an iron chain. After the defendant left his sons, they loaded some rails on the wagon and followed on, came into the gate, and took the farm road to the east and north of the Fallis house.

Emmett Fallis, the son, testifies, that he went to the stable with the deceased; that, after getting the chain, they started back to their house; that Selus Harrod was salting his cattle as they went to the stable and was near the pond, as they returned. He says his father, the deceased, called to defendant and asked if he was willing to settle; that defendant replied he was not going to settle; that he didn't owe him anything; that they, he and his father, started on to the house. When they got to the top of the hill, they met John Harrod driving the wagon and Preston Harrod walking behind; that John Harrod said to his father, the deceased: "I see you and the old man are in a racket

again." His father said: "I just asked the old man to settle."

While John and deceased were talking the old man, the defendant, came up. This witness says the defendant said nothing and did nothing when he came up; that the only thing he remembered about the commencement of the trouble was his father began by telling Selus Harrod, the defendant, he wasn't a bit afraid of the pistol he had buckled around him.

Selus told his father that he had cursed him, and his father denied it. Says John Harrod did not offer to fight; got off his wagon, when the deceased started to his father, the defendant; that Pres. had not spoken a word. When John got between his father and the deceased, deceased put his hand on him and told him to "keep back;" when his father stepped toward the defendant, Pres. Harrod jerked the axe off the wagon and struck his father and killed him. Old man Harrod did not say a word to John or Pres. "My mother was coming up just as Pres. struck Pa."

Defendant was standing at front wheel of wagon and deceased at hind wheel during this last talk. Mrs. Fallis says she reached there in time to hear defendant accuse her husband of cursing him the day before, saw him take a step towards defendant, *drop the chain*, saw John step between them, heard her husband tell John to "keep back." He pushed John and *staggered* him. Pres. then struck deceased with the axe. Pres. said nothing.

The defendant testified: After stating that Fallis went to the stable, he says, as Fallis returned, he accosted defendant, saying, "'You damned old rascal you, you want to have me arrested again, don't you?' He called me a damn thief." He says deceased then started on home, met the boys and turned and followed the wagon back. "I went across to get on the wagon when I left the fence. The first thing he said to me was 'you have got that —— damned old navy strung

around you.'" Says deceased continued abusing him. Had chain in his hand. "John got down between us, then Fallis said, 'I'll clean you all out,' and just as he said this, he knocked John down. After he knocked John down his motion was at me. I retreated and Pres. struck deceased with the axe just at that time."

John Harrod corroborated his father. He says when he and Pres. first came in sight of his father and Fallis, they were near the ponds and he heard Fallis say, "You are a liar." "I called to him, and said 'Hello! Barney, what's the matter?' He said, 'The old man and me is fussing.' Fallis was very mad. Cursed the old man bitterly. He said to the old man: 'Here you are with that old pistol strung around you. I ain't afraid of your old pistol or you either.' I tried to pacify him. He said to me, 'John, if you don't tend to your business I'll settle you.' He had chain in his hand. When he made at my father, I slipped off the wagon and stepped between them. He knocked me down on my hands and knees. Struck me on the left side of head. Father retreated, Barney was between seven and eight feet of father. He was making for father when Pres. struck him. Pres. nor I either were armed. The deceased died instantly. This occurred about 9:30 or ten o'clock in the forenoon, December 26, 1889, in Gentry county."

The court over the objections of defendant admitted evidence tending to show defendant had made threats against deceased.

At the close of the state's case defendant asked the court to instruct the jury to acquit defendant, which the court declined. Defendant offered to prove by James T. Enyart, Edmund W. Harrod, Robert Pulsifer, James Rowner, John Parberry, Mrs. Peck, Thomas Potter, that deceased had made threats recently before the killing against the defendant and his sons, which the court refused to hear and defendant excepted.

There was evidence tending both to impeach and sustain the character of Edmund Harrod. Edmund Harrod was called as a witness and was asked, by defendant's counsel, this question: "I will get you to state, Mr. Harrod, if shortly before the killing the deceased came to you in the big road south of the Harrod farm and requested you to get a gun and go with him up into the cornfield where the Harrods were and to help him kill the Harrods and haul them out of the cornfield or anything of that substance?"

To which counsel for the state objected as immaterial. The court sustained the objection, and defendant excepted. Thereupon the learned judge said: "Let me ask you a question. Did any such thing as that ever occur?" Witness: "Similar to that, sir."

The court: "Well, now, what McCullough asked you, did that ever occur in your presence? Did you ever hear such a thing?" A. "Similar to that, sir." Thereupon, the state's attorneys proceeded to cross-examine this witness at length on this evidence; and several witnesses were called to impeach his character for truth.

The court on behalf of the state instructed the jury as follows:

"1. The court instructs the jury that the defendant is presumed to be innocent of the offense charged; that before you can convict him the state must overcome that presumption, by proving him guilty beyond a reasonable doubt. If you have a reasonable doubt of the defendant's guilt, you must acquit him. But a doubt to authorize an acquittal must be a substantial doubt founded on the evidence, and not a mere possibility of his innocence.

"2. Premeditatedly means thought of beforehand for any length of time however short. Malice, as used in the indictment, does not mean mere spite, ill-will or dislike, as it is ordinarily understood; but it means that

condition of mind which prompts one person to take the life of another without just cause or justification, and it signifies a state of disposition which shows a heart regardless of social duty and fatally bent on mischief. Malice aforethought means that the act was done with malice and premeditation.

"3.   Wilfully, as used in these instructions, means intentionally, not accidentally; and, in the absence of qualifying facts or circumstances, the law presumes that a person intends the ordinary and probable result of his acts and conduct.

"4.   Deliberation means in a cool state of the blood. It does not mean brooded over or reflected upon, for a week, or a day, or an hour; but it means an intent to kill, or to aid, abet and encourage another to kill, executed in a cool state of the blood, in furtherance of a formed design to gratify a feeling of revenge or to accomplish some other unlawful purpose, and not under the influence of passion suddenly aroused by some provocation.

"5.   The court instructs the jury that the deliberation and premeditation necessary to constitute murder in the first degree may be inferred from all the facts and circumstances of the case, provided it can be done beyond a reasonable doubt.

"6.   The jury are the sole judges of the credibility of the witnesses, and the weight to be given to their testimony.   In determining such credibility and weight, you will take into consideration the character of the witnesses, their manner on the stand, their interest, if any, in the result of the trial, their relations to or feelings towards the defendant or the deceased, their hopes and their fears, bias or prejudice, the probability or improbability of their statements, as well as all the facts and circumstances given in evidence.   In this connection you are further instructed that, if you shall believe that any witness has knowingly sworn falsely to any

material fact, you are at liberty to reject all or any part of such witness' testimony.

"7. In considering what the defendant has said, you should consider it all together. He is entitled to the benefit of what he said for himself, if true, as the state is to the benefit of what he said against himself, if anything; but in any statement of defendant proved by the state, what he said against himself the law presumes to be true because against himself, and what he said for himself, you are not bound to believe because said in a conversation proved by the state; you may believe it or disbelieve it, as it may be shown to be true or false by all the evidence in the case.

"8. Under the statute of this state the defendant is a competent witness to testify in his own behalf, but the fact that he is a defendant testifying in his own behalf may be taken into consideration by the jury in determining the weight to be given to his testimony.

"9. All persons are principals who are guilty of acting together in the commission of an offense. When any offense is actually committed by one person, and others are present, and, knowing the unlawful intent, aid, abet, help, comfort, maintain or assist the person actually engaged in the commission of the unlawful act, such persons so aiding or encouraging are principals and equally guilty with the person who strikes the fatal blow. But bare presence of the defendant at the time the fatal blow is struck would not justify his conviction, unless the evidence shows that he committed some act, aiding, abetting, assisting or encouraging the person who did strike the fatal blow, or had, before the striking of said fatal blow, conspired with the person striking the same, to kill or do the said deceased some personal injury.

"10. If the jury believe from all the facts and circumstances in evidence, that Preston Harrod, John Harrod and the defendant, Selus Harrod, went to the

place of the difficulty referred to in the evidence, at the time and place mentioned in the indictment, the defendant being armed with a deadly weapon, and that the defendant then and there, wilfully, premeditatedly, deliberately and of his malice aforethought, provoked a difficulty, or aided and abetted his said sons in provoking a difficulty with the deceased, Barnett H. Fallis, and that the defendant then and there, by his words, acts or conduct, wilfully, intentionally, maliciously, premeditatedly and deliberately, incited and encouraged the said Pres. Harrod to inflict upon deceased some great bodily harm, or to kill him, and the said Pres. Harrod, so being incited and encouraged, then and there struck the deceased, Barnett Fallis, with an axe, the same being a deadly weapon, producing death, you will find the defendant guilty of murder in the first degree, even though you should further believe that the killing was done by said Pres. Harrod in a heat of sudden passion.

"11. The court instructs the jury that if they believe from the evidence, facts and circumstances in the case, that the defendant, wilfully, deliberately, premeditatedly and of his malice aforethought, for the purpose of gratifying a spirit of revenge and malice, armed himself with a deadly weapon, and together with his sons, John and Selus Preston Harrod, voluntarily placed himself in the way of the deceased, for the purpose of provoking a difficulty with him, and thereupon to kill him or to do him great bodily harm, or to cause the same to be done by his said sons or one of them, and that such difficulty if any was commenced by the wilful acts, conduct and language of the defendant, with the purpose aforesaid ; that thereupon the said Selus Preston Harrod, encouraged and prompted by the acts and conduct of defendant, intended by the defendant for that purpose, struck the deceased in a vital part and killed him with an axe, which was then and there a deadly weapon, the jury will find the defendant

guilty of murder in the first degree and so state in their verdict; and in such case it makes no difference that the fatal blow was struck by one of said sons without premeditation and in a sudden heat of passion.

"12. The court instructs the jury that he who wilfully—that is intentionally—uses upon another at some vital point a deadly weapon, as an axe, must, in the absence of qualifying facts, be presumed to know that the effect is likely to be death, and knowing this must be presumed to intend the death which is the probable and ordinary consequence of such an act; and if such deadly weapon is used without just cause or provocation, he must be presumed to do it wickedly and from a bad heart. If, therefore, they believe that Selus Preston Harrod, the son of the defendant, took the life of Barnett H. Fallis by striking him in the head or face with an axe, with a manifest design to use such weapon upon him, and with sufficient time to deliberate and fully form the conscious purpose to kill, and without sufficient reason or cause or provocation, then such killing is murder in the first degree, and while it devolves upon the state to prove the wilfulness, deliberation, premeditation and malice aforethought, all of which is necessary to constitute murder in the first degree; yet these need not be proved by direct evidence, but may be deduced from all the facts and circumstances attending the killing; and if the jury shall further believe from the evidence that the defendant here was then and there present, premeditatedly, deliberately, wilfully and of his malice aforethought, inciting and encouraging his son, Selus Preston Harrod, by words or conduct to inflict great bodily harm upon the deceased, then the defendant is equally guilty of murder in the first degree, and the jury should so find, In such case it is immaterial which of the two struck the fatal blow.

"13. The court instructs the jury that if they believe from all the facts and circumstances in evidence

that the defendant wilfully, deliberately, premeditatedly and of his malice aforethought formed the design of meeting the deceased in the presence and reach of his sons, John and Selus Preston Harrod, and of then and there, with their aid and assistance, chastising him or inflicting upon him corporal punishment or provoking a difficulty with him, the natural and probable consequence of which would be an assault and battery; and the jury further find from all the evidence that, in consequence of such design so formed, the defendant did so meet the deceased, and, in pursuance thereof, he or either of his said sons then and there sought or provoked a difficulty with him, and that, in the course of the difficulty, the said Selus Preston Harrod struck the deceased in a vital part with an axe and killed him, at the time and place mentioned in the indictment, then even though the jury may further believe the said axe was so used without the knowledge of the defendant, and though they may believe the prisoner did not contemplate killing the deceased or doing him great bodily harm, they will find him guilty of murder in the second degree.

"14.     The court instructs the jury that if you shall believe from the evidence, beyond a reasonable doubt, that Selus Preston Harrod at the time and place mentioned in the indictment, wilfully and maliciously without just cause or excuse, with an axe, which was then and there a deadly and dangerous weapon, struck and killed the deceased, Barnett H. Fallis; that the defendant was then and there present, wilfully, premeditatedly and of his malice aforethought, but without deliberation, encouraging and inciting by his acts, conduct or words the said Selus Preston Harrod to so kill the deceased, you will find the defendant guilty of murder in the second degree.

"15.     If the jury shall find the defendant guilty of murder in the first degree, they will simply by their verdict so say.     In that case they will have nothing

whatever to do with the punishment to be inflicted.   If
the jury should find the defendant guilty of murder in
the second degree, they will assess his punishment at
imprisonment in the penitentiary for a term of not less
than ten years."

To the action of the court in giving each and all of
said instructions, the defendant by his counsel objected.
The court overruled said objection, and to the action of
the court in overruling said objection and giving said
instructions, the defendant by his counsel then excepted.

Thereupon the court instructed the jury on behalf
of the defendant as follows :

"1.   The law clothes the defendant with the pre-
sumption of innocence, which attends and protects him
until it is overcome by testimony which proves his guilt
beyond a reasonable doubt ; which means that the evi-
dence of his guilt as charged must be ·clear, positive
and abiding, fully satisfying the minds and consciences
of the jury.   It is not enough, in a criminal case to jus-
tify a verdict of guilty, that there may be strong sus-
picions or even strong probabilities of his guilt ; but
the law requires proof, by legal and credible evidence,
of such a nature that when it is all· considered it pro-
duces a clear, undoubting and  entirely satisfactory
conviction of defendant's guilt ; and the burden of
establishing the guilt of the defendant as above required
is on the prosecution.   The reasonable doubt, above
referred to, means a substantial doubt of the defend-
ant's guilt as charged, and not a mere possibility of his
innocence.

"2.   If the jury believe from the evidence that
there was no common design between Preston Harrod,
John Harrod .and Selus Harrod, or between Preston
Harrod and Selus Harrod, to kill the said Barnett
Fallis, nor to do him any great bodily injury, nor pro-
voke a difficulty with him, and that there was no con-
spiracy or confederacy between them to go to the
premises of the said Barnett Fallis, and there kill him

or to do him some great bodily injury or provoke a difficulty with him, but that while there the said Preston Harrod did strike and kill the said Barnett Fallis with an axe, and that the said defendant, Selus Harrod, did not aid, assist or abet the said Preston Harrod to kill the said Barnett Fallis, or did not intentionally encourage the said Preston Harrod by his presence, acts or declarations to commit the act, then the jury ought to acquit the defendant.

"3. If the jury believe from the evidence that prior to the twenty-sixth day of December, 1889, the said defendant and the said Barnett Fallis had had difficulties, and that ill and unfriendly feelings existed between them, and that on the twenty-fifth day of December, 1889, the said Fallis had assaulted and abused the said defendant, and had threatened to kill him or do him some great bodily harm, and that upon other occasions prior to said twenty-sixth day of December, 1889, the said Fallis had threatened to kill the defendant or to do him some great bodily harm or personal injury, and that such threats were communicated to the said defendant, then the court instructs the jury that the said defendant had a right to carry a pistol or other weapon in order to protect himself against any bodily harm or injury the said Fallis might contemplate and intend to inflict upon him.

"4. The jury are instructed that the mere fact that defendant, Selus Harrod, was present and engaged in a quarrel or controversy with the said Barnett Fallis is not evidence in itself that the said Selus Harrod intended to kill the said Barnett Fallis or to do him any great bodily injury, or that he was present for the purpose, or that he did aid, abet, or assist, or encourage, or incite the said Preston Harrod to kill the said Fallis; and, unless you believe from the evidence that the said Selus Harrod did aid, abet, assist or encourage the said Preston Harrod to kill the said Barnett Fallis, the jury ought to acquit the defendant, Selus Harrod, unless you

further believe from the evidence that the defendant and Preston, prior thereto, agreed or conspired to kill said Fallis or to do him some great bodily harm, and that such killing was the result of carrying into effect such previous design."

Counsel for the defendant further prayed the court to instruct the jury as follows:

"5. If the jury believe from the evidence that the defendant and his sons, John and Preston, were in the lawful pursuit of their own business, and that the said Barnett Fallis came to where they were and entered into a controversy with the defendant about a matter of difference between them, and about which the said defendant and the said deceased had been disputing; and that the said deceased then and there renewed such controversy with said defendant and became angry at the defendant; and you further find that, at said time, the said deceased held in his hand the chain mentioned in the evidence, and that the said deceased started towards the defendant in a threatening manner, and also threatened to kill the said defendant or to do him some great bodily injury; and you further find that the defendant's son, John, stepped in between the said deceased and the said defendant to prevent said deceased from assaulting said defendant, his father, and you further find that said deceased told said John to keep back, or out of the way, and at the same time struck him and knocked him down, or that he pushed him down to renew his assault upon the defendant, and you may further believe that there was at the instant reasonable grounds to believe, and the said defendant and the said Preston Harrod did believe, that the deceased designed by such attack to kill the said defendant, or to do him some great bodily injury, and that the defendant, so believing, retreated or stepped back and behind his son, John, and the said Preston, so believing, had the right to protect his father, the said defendant, from such intended assault and injury, even to the taking of the life of said deceased; and

such killing of the assailant under such circumstances was excusable in law, and you should find the defendant not guilty ; and the jury are instructed, that, in order to defendant's defense in such case, it would not be necessary that the defendant was in great actual danger of being injured by such assault, but that it was sufficient to justify the said Preston Harrod that there were reasonable grounds to believe that such danger was real and about immediately to ensue.

" 6. The jury are instructed that if they believe from the evidence that the killing of Barnett Fallis was not the result of, or done in execution of, a conspiracy existing between the defendant, Selus Harrod, John Harrod and Preston Harrod, to kill said Barnett Fallis, or to do him, the said Fallis, some great bodily harm, you will acquit the defendant ; and that to authorize a conviction for conspiracy it must appear from the evidence, to the exclusion of every reasonable doubt, that the defendant took part in the difficulty that resulted in the death of said Barnett Fallis, or in some manner aided, abetted, advised or encouraged the same, and that this was done in pursuance to a common design.

" 7. If the jury shall find from the evidence in this cause that Preston Harrod struck and killed the said Barnett Fallis, and that he did the act upon his own independent motion, and not in the execution of any conspiracy or common design to which the defendant, Selus Harrod, was a party ; and was not encouraged or incited thereto by the defendant, then the jury ought to acquit the defendant, Selus Harrod, no matter whether the act of Preston Harrod in killing said Barnett Fallis was justifiable or not.

" 8. If the jury believe from the evidence that there was no common design between Preston Harrod, John Harrod and Selus Harrod, or with Preston Harrod, to kill the said Barnett Fallis, or to do him any great bodily injury, nor to provoke a difficulty with him, and that there was no conspiracy or confederacy between

The State v. Harrod.

them to go to the premises of the said Barnett Fallis, and there kill him or do him some great bodily injury, or provoke a difficulty with him, but that while there the said Preston Harrod did strike and kill the said Fallis with an axe, and that the said defendant did not aid, assist or abet the said Preston Harrod to kill the said Barnett Fallis, and did not intentionally encourage the said Preston Harrod by his presence, acts or declarations to commit the act, then the jury ought to acquit the defendant.

"9.   It devolves upon the state to prove beyond a reasonable doubt, that the killing of Fallis was the result of a previous agreement or understanding or common design, made and entered into by and between the defendant on trial and his two sons, before you can find the defendant, Selus Harrod, guilty ; and even though the jury may believe that the defendant, Selus Harrod, was present and actually engaged in a controversy with Fallis, yet if you further believe that Preston Harrod in a sudden heat of passion, and not in furtherance of a previous understanding with, or present request of, his father, struck said Fallis with an axe and thereby caused his death, you should find the defendant not guilty.

"10.   The court instructs the jury that mere words, however grievous in law, will not justify an assault."

Which instructions the court refused to give.   To the action of the court in refusing to give said instructions the defendant by his counsel then excepted.

*McCullough & Peery*, *W. W. Ramsay* and *Johntone & Craig* for appellant.

(1)   The court erred in admitting evidence offered by the prosecution.   As a condition precedent to the admission of evidence of defendant's threats, it was essential to show that the defendant was the aggressor ; that he assaulted the deceased or did something to carry out his alleged ill-will.   Wharton's Crim. Evid. [8 Ed.]

sec. 757; *State v. Taylor*, 64 Mo. 361; *State v. Alexander*, 66 Mo. 162; *State v. Harris*, 59 Mo. 550. (2) There was evidence that the deceased was the aggressor; and hence the evidence of threats of deceased against defendant was improperly excluded. *State v. Harris*, 59 Mo. 550; *State v. Alexander*, 66 Mo. 161; *State v. Adams*, 76 Mo. 355; *State v. Downs*, 91 Mo. 19; *State v. McNamara*, 100 Mo. 114. (3) There was no evidence tending to show a conspiracy to kill on part of the defendant and his sons, and, therefore, instruction, numbered 13, was erroneous. *State v. Thompson*, 83 Mo. 257; *State v. Gerber*, 80 Mo. 94. (4) The court erred in refusing to give the jury instruction, numbered 5, asked by defendant on the question of self-defense. There was ample evidence to authorize it. The son had the same right as the father to strike for the protection of the latter. R. S. 1889, sec. 3462; *State v. Linney*, 52 Mo. 40; *State v. Palmer*, 88 Mo. 568; *Nichols v. Winfrey*, 79 Mo. 544; *Erwin v. State*, 29 Ohio St. 186. (5) The fact that the deceased was not yet in striking distance of defendant, when he was struck by Pres., makes no difference. He was advancing upon defendant with the chain up, and would have reached him in a step or two more, had his progress not been arrested. The assault was complete, and Pres. was not required under the circumstances to see him actually strike his father, or to see whether he was going to strike him, before he could strike in defense of his father. *State v. Van Noy*, 65 N. C. 334; *Stephens v. Myers*, 4 C. & P. 349; *State v. Davis*, 1 Iredell (N. C.) 125; *State v. Crow*, 1 Iredell, 376; 1 Russ. on Crimes [8 Am. Ed.] side p. 751; *State v. Mayfield*, Phil. Law. 109; *State v. Neely*, 74 N. C. 426.

*John M. Wood*, Attorney General, for the State.

(1) The statements of defendant as to prior difficulties with deceased and his threats against the latter

were admissible in evidence. *State v. Glahn*, 97 Mo. 679. ( 2 ) There was no error in refusing to permit the witnesses to testify to threats alleged to have been made by deceased towards defendant, it not appearing that they had ever been communicated to defendant or his son. *State v. Clum*, 90 Mo. 482 ; 2 Bishop, C. P., sec. 610, *et seq.* ( 3 ) The thirteenth instruction given on behalf of the state was proper. *State v. Walker*, 98 Mo. 95. ( 4 ) The fourteenth instruction correctly declared the law as to a person wilfully, premeditatedly and of his malice aforethought aiding and abetting the commission of a homicide. *State v. Hollenscheit*, 61 Mo. 302, and authorities cited ; *State v. Testerman*, 68 Mo. 413 ; *State v. Phillips*, 24 Mo. 475 ; *State v. Miller*, 67 Mo. 607 ; *State v. Cox*, 65 Mo. 29 ; *State v. Miller*, 100 Mo. 606 ; R. S. 1889, sec. 3944.

GANTT, P. J.—The defendant, Selus Harrod, was jointly indicted, with his two sons, John Harrod and Selus Preston Harrod, at the March term, 1890, of the Gentry county circuit court. A change of venue was awarded them on their joint application to the circuit court of Nodaway county. A severance was granted, and the father, Selus Harrod, was tried at the June term, 1890, in Nodaway county, and convicted of murder in the second degree, and sentenced to ten years' term in the penitentiary. He appeals to this court.

I.    The first error complained of is the admission of evidence by the circuit court of certain statements of the defendant, in the nature of threats against the deceased.

We think the court did not err in receiving this evidence. Wharton's Crim. Evidence, sec. 756 ; *State v. Talbott*, 73 Mo. 347–360.

II.    It is also assigned as error that the circuit court refused to permit defendant to prove that deceased, on several occasions and within a few days of the homicide,

had made bitter threats against defendant. All of the witnesses to these threats and expressions of ill-will were on the stand, and the offer to prove was definite and specific, as to time and place. In refusing this evidence of threats by the deceased, there was manifest error.

There was evidence that the deceased was the aggressor; that, on the day before the homicide, he had assaulted the defendant and abused him at the gate leading into the public road, near the residence of deceased; that he had a real or imaginary grievance, growing out of the depredations of defendant's cattle.

On the morning of the difficulty which resulted in the death of Fallis, defendant and his sons were on defendant's premises, and defendant was attending to his own business, salting his cattle and laying up his fence. That Fallis began anew the quarrel of the previous day, there can be no doubt, on the evidence in the record before us. That Fallis, the deceased, went out of his way to renew this quarrel as the sons drove up with the load of rails, seems equally well settled.

His own son says his father began the quarrel about the settlement, and corroborates the evidence of the other witnesses to the fact that Fallis had an iron chain in his hand; that he struck or pushed John, the son, out of his way, in his effort to reach the defendant and was advancing on defendant, when he was struck by Preston Harrod. Under these circumstances, these threats made so recently before this unfortunate affair became of the utmost importance in characterizing the conduct of Fallis and explaining his intention and purpose in assaulting the defendant and his son. Wharton's Crim. Ev., sec. 757; *State v. Elkins*, 63 Mo. 159; *State v. Downs*, 91 Mo. 19; *State v. Bailey*, 94 Mo. 311; *State v. Sloan*, 47 Mo. 604.

III. The defendant complains that the circuit court erred in giving instructions in behalf of the state.

From an examination of instructions numbered 10, 11 and 13, it will be seen, the court assumed there was some evidence that the defendant and his sons sought or provoked the difficulty which resulted in the death of Barnett Fallis. We have read the evidence preserved in this record carefully and we find nothing in the facts disclosed that can be tortured so as to show the defendant or his sons *sought* or *brought* on this difficulty.

Indeed, unless we discard all presumptions of innocence and impute criminal motives to the actions apparently lawful and praiseworthy in themselves, we can find nothing on which to justify these instructions, based on the idea of a conspiracy. The deceased began the quarrel and forced the fighting from the beginning. The defendant was on his own premises both on the twenty-fifth and twenty-sixth days of December. He was feeding and salting his own cattle. The deceased was the sole aggressor on both days.

Under such a state of evidence it is error for the court to even intimate that defendant began or provoked the difficulty. He submitted to the assault on Christmas day and like a good citizen appealed to the courts to right the wrong. His going to his own farm the next day, to salt his cattle, and fence his haystacks, cannot, in the light of his conduct after reaching the farm, by any fair intendment, be construed into a seeking of deceased. For the reason, that there was no evidence to justify these instructions, it was error. *State v. Bailey*, 57 Mo. 131.

The court erred in refusing to instruct the jury upon the law of self-defense. When it is considered that the deceased made a violent and unprovoked assault on defendant on the day previous to the homicide ; that deceased was a man forty years of age, and weighing one hundred and eighty to two hundred pounds, six feet tall ; that he held an iron chain, some six feet long, in hand ; that he was very angry ; that

defendant was a man sixty-five years old and suffering with heart disease; that deceased had come out of his way to renew the quarrel of the previous day; and had begun the affray by knocking John Harrod down and was advancing with the drawn chain and was only six or seven feet from the old man, the defendant, it seems clear that the right of self-defense on the part of defendant became complete at that moment, and whatever right the defendant had, the son had for the protection of his father.

Certainly it should have been left to the jury, under a proper instruction, to say whether Preston Harrod had not reasonable cause to apprehend a design on the part of deceased, Fallis, to kill his father or do him some great bodily harm and that there was cause to apprehend immediate danger of such design being accomplished and that he killed deceased to prevent the accomplishment of such design, and if so to acquit the defendant.

For if Fallis was killed by Preston Harrod under these circumstances no crime had been committed in killing him, as there was no evidence to justify the court in saying that either the defendant or his sons had provoked or brought on the quarrel. And in such a case it was not necessary that the defendant should be in actual danger; it was sufficient if there was reasonable ground to believe such danger was real and imminent. *Goins v. State*, 46 Ohio St. 457; R. S. 1889, sec. 3462; *State v. Starr*, 38 Mo. 270; *State v. Eaton*, 75 Mo. 591; *Pond v. People*, 8 Mich. 150; *Nichols v. Winfrey*, 79 Mo. 544.

For the errors mentioned, the cause is reversed and remanded for a new trial.