## THE STATE v. MAGGIE MYERS, Appellant.

### Division Two, July 3, 1906.

1. **INFORMATION: Indorsement of Witnesses' Names: Continuance.** Witnesses whose names are indorsed on the information by leave of court after the jury to try the case have been sworn, may be called by the State and may testify: And, where the defendant does not charge or contend that the names were held back by the prosecuting attorney and thus belatedly indorsed on the information in order that he might spring a surprise on the defendant, the court should overrule defendant's motion for a continuance.

2. **JURORS: Competency: General Challenge: Newspaper Reports.** Where the challenge to the jurior on his *voir dire* was, "Defendant challenges this juror," the challenge was too general to authorize the court to reject the juror on the ground that the juror had read in the newspapers what purported to be the confession of the accomplice which materially aided in defendant's conviction. If the objection was intended to be based specifically upon the ground of opinions formed from reading newspaper reports, the challenge should have been specifically made.

3. ———: ———: ———: ———: **Confession.** A juror who states that, notwithstanding he had formed an opinion of defendant's guilt from reading in the newspapers the unsworn and partial confession of her accomplice and a report of the evidence at his trial, he would be governed solely by the evidence and render an impartial verdict, is not incompetent.

4. **ACCOMPLICE: Competent Witness.** An accomplice in the crime for which defendant is being tried, who has been convicted upon a separate charge, is a competent witness against defendant. The fact that a motion for new trial in the accom-
198 Sup—15

plice's case was pending, and that he was persuaded by his mother to testify in the hope that clemency might be extended to him, did not affect his competency, though it did his credibility.

5. ———: **Declarations After Crime.**   Declarations of confederates against each other after the enterprise is at an end, whether by accomplishment or abandonment, are incompetent as against such conspirators; but when such declarations were introduced without objection, and were brought out at length by defendant on cross-examination, they afford no ground for a new trial.

6. ———: **Confession: Credibility: Whole Instrument.**   Where dedefendant, in order to discredit and contradict the testimony of an accomplice, read extracts from a purported confession made by him, it is proper to permit the State to introduce the whole of such confession in order that the jury may determine whether or not his two stories were inconsistent and contradictory.

7. **LETTERS: Handwriting: Signature.**   Statements and letters, material, and in the handwriting of the defendant, though not signed by her, are competent evidence.

8. ———: **Juror: Ability to Read.**   No statute requires that a juror be able to read and write, and the fact that one juror testified that he could not read is no reason for granting a new trial on the ground that it became a question at the trial whether certain letters admitted in evidence were in the handwriting of defendant.

9. **ASSAULT: Weapons.**   An assault may be charged to have been committed with different kinds of weapons, and  where the charge is that it was made with all the weapons named, it is not insufficient because it does not state with which particular weapon the murder was committed.

10. **DEFENDANT'S CONDUCT.**   The fact that defendant did not attend her murdered husband's funeral was a circumstance for the consideration of the jury.

11. **SPECIAL TERM: Defendant In Jail.**   The fact that the defendant was in the jail of Jackson county when the judge called a special term of the circuit court of Clay county to try her does not show that that call was not in compliance with sec. 1606, R. S. 1899, which provides that "whenever any person charged with an offense shall be confined in jail two months before the regular term" the sheriff shall inform the judge, who may call a special term, etc.   And the judgment will not be reversed on the ground that that statute was not complied with, when that point was in no wise made in the trial court.

12. **MURDER: Instructions: Deadly Weapons.** The instructions, set out in paragraph 12 of the opinion, not only correctly submitted to the jury the question of whether or not the weapons used were deadly weapons, but in other respects are correct declarations of law as to what constitutes murder in the first degree.

Appeal from Clay Circuit Court.—*Hon. J. W. Alexander,* Judge.

AFFIRMED.

*Frank Gordon, R. B. Ruff, W. E. Fowler* and *Jos. S. Brooks* for appellant.

(1). The court erred in refusing to grant defendant a continuance, on the ground that the names of the witnesses, Frank Hottman, Nettie Hottman, Bertha Hottman, Ella Hottman and John Hottman, were not indorsed upon the information, and defendant was not otherwise notified that such witnesses were to be used against her till after the jury was impaneled and sworn to try the cause. Sec. 2517, R. S. 1899; State v. Steifel, 106 Mo. 133; State v. Nettles, 153 Mo. 469; State v. Roy, 83 Mo. 269; State v. Henderson, 186 Mo. 473; State v. Bailey, 88 S. W. 733; State v. Shreve, 137 Mo. 5. (2) The court erred in refusing to grant defendant a continuance on the ground that the following named witnesses were offered against her: Lydia Meinsen, Fannie McClaskey, J. S. Prewitt, F. W. Bowen, and John Stohl, and whose names were not endorsed on the information. (3) The court erred in overruling defendant's challenge for cause of the following named jurors: Ambrose Lancaster, Harry Golden, John V. Crossett, J. S. Borgnier, Samuel D. Wharton, Fred E. Miller, J. M. Soper, and John C. Capps, for the reason that said jurors testified on their *voir dire* examination that they had formed opinions, as to the guilt or innocence of defendant, from having read a copy of the confession of Frank Hottman, pub-

lished in the Kansas City newspapers. State v. Foley, 144 Mo. 600; State v. Culler, 82 Mo. 625; State v. Hultz, 106 Mo. 41; State v. Robinson, 117 Mo. 649; sec. 2116, R. S. 1899. (4) The court erred in permitting the witness, Frank Hottman, to testify against defendant, over her objection, because it appeared by the preliminary examination of the witness as to his competency that by his testimony he was an accomplice, and had been convicted of murder in the first degree on an information charging him with the same crime for which defendant was on trial, and for the reason that said Frank Hottman was wholly incompetent as a witness in the case. State v. Miller, 100 Mo. 606; State v. Chyo Chiagk, 92 Mo. 395. (5) The court erred in permitting witnesses to testify as to acts and declarations of the witness Frank Hottman after the consummation of the crime. State v. Rose, 29 Mo. 32; State v. Duncan, 64 Mo. 262; State v. Barham, 82 Mo. 67; State v. Fredericks, 85 Mo. 145; State v. McGraw, 87 Mo. 161; State v. Reed, 85 Mo. 194; State v. Beaucleigh, 92 Mo. 490. (6) The court erred in admitting in evidence the confession of Frank Hottman made at Walla Walla, and in permitting it to be read to the jury. State v. Brennan, 164 Mo. 509; State v. Melrose, 98 Mo. 594; State v. Hildebrand, 105 Mo. 318; State v. Minton, 116 Mo. 605. (7) The court erred in admitting in evidence the letter and paper claimed to have been received by the witness, Mrs. Hottman, from one Ella Schultz, said letter and paper not being shown to have been written by defendant, and the matter therein contained being otherwise immaterial and irrelevant. (8) The court erred in refusing to grant defendant a new trial for the reason that it became a question in the trial of the case as to whether or not certain letters and papers were in the handwriting of defendant, and one of the jurors who tried the cause testified on his *voir dire* examination that he could not read or write. Sec. 4679, R. R. 1899; State v. Thompson, 141 Mo. 408; Bank v.

Hoffman, 61 Mo. App. 203. (9) The indictment is insufficient and the demurrer and motion to quash filed by defendant should have been sustained. State v. Hagan, 164 Mo. 654; State v. Rector, 126 Mo. 328; State v. Furgerson, 152 Mo. 92. (10) The court erred in permitting the witness Stohl to testify that he saw the defendant and Frank Hottman at Higginsville together after the killing of the deceased. (11) The court erred in permitting the witness Nettie Hottman to testify over the objection of defendant, in answer to the following question: "How often did she write to him?" (meaning Frank Hottman). "How long after Clarence was killed was it before you burned up the letters of this defendant?" and to testify over the objection of defendant that "defendant did not attend her husband's funeral." (12) The court erred in permitting the witness Frank Hottman to testify over the objection of the defendant in answer to the following questions: "What wages did you get at the Confederate Home?" "Why did you come to Kansas City at that time? Who if anyone, invited you?" and "Had she written to you to come?" the questions having reference to a time long previous to the alleged conspiracy. (13) The call of the special term of court in which defendant was tried was not in compliance with the requirements of section 1606, Revised Statutes 1899, under which the call of the special term was made by the judge of the court. (14) The court erred in giving instructions 3 and 4 on behalf of the State.

*Herbert S. Hadley,* Attorney-General, and *John Kennish,* Assistant Attorney-General, for the State.

(1) The court did not err in refusing to grant the defendant a continuance on the ground that the names of Frank Hottman, Nettie Hottman, Ella Hottman and John Hottman, witnesses for the State, were not indorsed upon the information, and that defendant was

not otherwise notified that such witnesses were to be used against her until after the jury was impaneled and sworn to try the cause.    It is manifest that defendant was not entitled to a continuance, as requested.    After both sides had announced ready, when the trial. had commenced and defendant had been placed in jeopardy, there was no other course open to the trial court but to overrule the objection of defendant and proceed to trial, and also to overrule the informal affidavit of defendant for a continuance of the case to the next term of court. If during the trial of the case it had been made to appear to the court that the State had taken an undue advantage of defendant by purposely refraining from indorsing on the information the names of the material witnesses for the State, it would nevertheless have been the duty of the court to have proceeded with the trial, and in case the jury returned a verdict of guilty to have granted a new trial to defendant for that reason.    To have stopped the trial at that stage, or to have continued the cause until the next term, would have enabled the defendant to have successfully interposed the plea of former jeopardy on a subsequent trial for the same offense.    Art. 2, sec. 23, Constitution; State v. Manning, 168 Mo. 418; Hill v. People, 26 Mich. 496; 1 Bish. New Crim. Prac., sec. 869a; Ballard v. State, 19 Neb. 609; R. S. 1899; sec. 2517; State v. Steifel, 106 Mo. 133; State v. Henderson, 186 Mo. 482; State v. Roy, 88 Mo. 268; State v. O'Day, 89 Mo. 559; State v. Nettles, 153 Mo. 464; State v. Tate, 156 Mo. 119; State v. Barrington, 198 Mo. 23.    (2) The court did not err in retaining on the panel of forty, from which the jury to try the defendant was selected, Ambrose Lancaster, Harry Golden, John V. Crossett, J. S. Borgnier, Samuel .D. Wharton, Fred E. Miller, J. M. Soper and John C. Capps.    The record shows that upon the close of the *voir dire* examination of each of the jurors objected to the defendant made the general objection:  ''Defendant challenged this juror.''    No specific ground of

challenge was given in any case.    State v. Forsha, 88
S. W. 754.    (3)    The court did not err in permitting
Frank Hottman to testify as a witness against the de-
fendant.    R. S. 1899, sec. 4680; State v. Riney, 137 Mo.
102; State v. Umble, 115 Mo. 461; State v. Walker, 98
Mo. 95; State v. Stewart, 142 Mo. 412; State v. Black,
143 Mo. 166.    (4)    No objection was made by the de-
fendant at the time to the evidence as to the acts and
declarations (except the confession) of Frank Hott-
man after the consummation of the crime, and "by a
uniform line of decisions it has been held that this
court will not pass upon the admissibility of evidence
when the record showed that it was received without
objection."    State v. McCullum, 119 Mo. 474; State v.
Lett, 85 Mo. 52; State v. Hope, 100 Mo. 347; State v.
Foster, 115 Mo. 448.    (5)    The court did not err in ad-
mitting in evidence the confession of Frank Hottman
made at Walla Walla, and in permitting it to be read to
the jury.    Hottman was cross-examined as to this con-
fession, and parts of it read to the jury by counsel for
defendant for the purpose of discrediting the witness.
Upon objection by the State, counsel for defendant was
informed by the court that such cross-examination as
to the confession would make the entire confession ad-
missible in evidence.    State v. Phillips & Ross, 24 Mo.
485; Prewitt v. Martin, Admx., 59 Mo. 325; State v.
Talbot, 73 Mo. 348; Wilkerson v. Eilers, 114 Mo. 245.

GANTT, J.—At the April term, 1904, of the crimi-
nal court of Jackson county, Missouri, at Kansas City,
Missouri, the prosecuting attorney of said county filed
the following information:

"State of Missouri, County of Jackson.
"In the Criminal Court of Jackson County, Mis-
souri, at Kansas City, Missouri, April Term, A. D.
1904.

"Now comes Roland Hughes, prosecuting attorney for the State of Missouri, in and for the body of the county of Jackson, and upon his official oath informs the court, that Maggie Myers, *alias* Aggie Myers, whose Christian name in full is unknown to said prosecuting attorney, late of the county aforesaid, on the 11th day of May, 1904, at the county of Jackson, State of Missouri, in and upon one Clarence Myers then and there being, feloniously, wilfully, deliberately, premeditatedly, on purpose and of her malice aforethought, did make an assault and with a dangerous and deadly weapon, to-wit, a certain club or bludgeon, a certain razor and a certain pair of scissors which she the said Maggie Myers alias Aggie Myers in her hands then and there had and held, she the said Maggie Myers alias Aggie Myers, in and upon the head, neck and body of him the said Clarence Myers then and there feloniously, wilfully, deliberately, premeditatedly, on purpose and of her malice aforethought did beat, bruise, cut, stab and wound thus and thereby, then and there feloniously, willfully, deliberately, premeditatedly, on purpose and of her malice aforethought, with the club or bludgeon, razor and scissors aforesaid, giving to the said Clarence Myers in and upon the head, neck and body of him, the said Clarence Myers, twenty mortal wounds of which said mortal wounds the said Clarence Myers, on the 11th day of May in the year aforesaid, at the county of Jackson and State of Missouri, then and there immediately died; and so the prosecuting attorney aforesaid, upon his official oath aforesaid, doth say, that the said Maggie Myers, *alias Aggie Myers* him the said Clarence Myers at the county aforesaid, in the manner and by the means aforesaid, feloniously, wilfully, deliberately, premeditatedly, on purpose and of

her malice aforethought did kill and murder; against the peace and dignity of the State.

"ROLAND HUGHES,
"Prosecuting Attorney.

"Roland Hughes, prosecuting attorney of Jackson county, Missouri, makes oath and says that the facts stated in the above and foregoing information are true, according to his best information and belief.

"ROLAND HUGHES.

"Subscribed and sworn to before me this 25th day of July, 1904.

"JOHN R. RANSON,
"(Seal.)          Clerk of the Criminal court
of Jackson County, Mo.
"By J. E. GILDAY, Deputy Clerk."

The defendant Maggie Myers was arrested and by her counsel filed motions to quash the information on the ground that it failed to state with which of the said several weapons mentioned in the information, said assault was made, and does not state whether the mortal wounds were inflicted with said club or bludgeon or with a razor or with a pair of scissors. This motion was heard and overruled, to which action of the court in overruling the same, the defendant duly excepted at the time. The defendant was duly arraigned upon this said information and entered a plea of not guilty thereto. An application for a change of venue on the ground of the prejudice of the inhabitants of Jackson county was made by the defendant and sustained by the court, and a change of venue was granted to the circuit court of Clay county, in the seventh judicial circuit of this State.

At a special term of the circuit court of Clay county, convened on the 5th day of June, 1905, the defendant was put upon her trial and convicted of murder in the first degree. Motions for a new trial and in arrest of judgment were duly filed, heard and overruled and exceptions saved. Thereupon the defendant was duly sentenced on the 24th day of June, 1905, in accordance with the verdict of the jury. From that judgment and sentence she has appealed to this court.

The evidence on the trial tended to prove the following facts:

On the 10th day of May, 1904, the defendant, Maggie Myers, and her husband, Clarence Myers, were living alone in a cottage at No. 2313 Terrace street in Kansas City, Jackson county, Missouri. They had been married about four years and had no children. Clarence Myers, the husband, was a printer by trade and was foreman of a printing office. At times he worked at night and slept in the daytime. He was industrious and had a well-furnished, comfortable home. The defendant, Maggie Myers, at the time mentioned, was about 28 years of age. Her maiden name was Brock, and for several years before her marriage she had lived with her parents in the city of Higginsville, Missouri. She had first married a man by the name of Payne, and lived with him for a time at Independence, Missouri. She procured a divorce from Payne and went to live with her parents at Kansas City, who in the meantime had moved to the latter place. There she married Clarence Myers. During the residence of the Brock family at Higginsville, a family by the name of Hottman resided near them, and the defendant was then on intimate terms socially with the children of the Hottman family. Frank Hottman, one of the Hottman children, though younger than the defendant, knew her well, and afterwards visited the Brock family at Kansas City, when the defendant, after her divorce from Payne, made her home there. After the defendant took

up her residence in Kansas City, and even after her marriage to Myers, she kept up her social relations with the Hottman family by visiting them occasionally, and by correspondence. The Hottmans also visited her. Frank Hottman received many letters from the defendant, and on the —— day of November, 1903, he went to Kansas City, ostensibly to find employment. He was then about twenty years of age. The defendant had promised to meet him at the Union Depot and did go there for that purpose; but being late, she failed to meet him. He went directly to her house and waited until her return. Hottman remained at the Myers house about one month and then went to his home at Higginsville. While at the Myers home he did no work, but he remained around the house most of the time during the day. At night while Myers was at work, Hottman and the defendant on different occasions together attended the theatre and dances. In the month of February, 1904, Hottman returned to Kansas City, was met at the depot by Mrs. Myers and remained at the Myers home from Saturday till the Monday following. In the latter part of April, 1904, the defendant went to Higginsville to visit the Hottmans. She was met at the depot by Frank Hottman, and during her stay of about a week was so much in Frank Hottman's company that the other members of the Hottman family objected to her conduct for that reason. When she returned to Kansas City, Frank Hottman boarded the same train with her, and went as far as Odessa, but returned to Higginsville the next day. On May 3, 1904, Frank Hottman received by mail a registered letter written by Mrs. Myers containing ten dollars in money, and a few days later went to Kansas City. Omitting from this statement at present the evidence of Hottman, it was shown by other evidence that after the arrival of Hottman at Kansas City, he and the defendant were seen together at a rooming house and at other places.

On Saturday night before the homicide, Clarence Myers heard a person on the porch of his house, got up and went out, but the person had disappeared. Clarence Myers related this occurrence to his neighbor McGowan in the presence of the defendant the next day. The following Tuesday night or Wednesday morning Clarence Myers was brutally murdered in his own home. The Myers home in which the murder was committed, was a one-story, five-room frame cottage fronting west on Terrace street. Approaching from the rear on the east, there was a porch, then the kitchen with an outer door facing the east. The kitchen extended to the north side of the house, and there was a bed room directly south of the kitchen with a door opening into the kitchen. On the west of this bed room, and west of the south part of the kitchen, was a dining room. There was a bed room north of the dining room and west of the north part of the kitchen; a door opened from the kitchen into the dining room. This door was directly west and opposite the outer kitchen door; it was on the north side of the east wall of the dining room and opened into the dining room and to the north, so that when opened it stood along and against the wall between the dining room and the bed room on the north. There was an opening, but no door, leading from the dining room to the bed room on the north, and also a door leading from the dining room to the parlor on the west, the latter being the front room of the house. A family named McGowan lived on the lot adjoining the Myers home on the north; on the south of the Myers home there was one vacant lot, and on the next lot a family named McCowan was living.

About three o'clock on the morning of the 11th of May, 1904, Frank McGowan, about fourteen years of age, went out of the McGowan house into the back yard, and when returning saw a light burning low in the Myers home. About five o'clock on the same morn-

ing, the milk man delivering milk at the Myers home walked by the back door of the kitchen and emptied the milk into a pan left on the shelf for that purpose. The back door was then shut and nothing unusual was noticed. About an hour later, a little before six o'clock, Leo McGowan, a boy ten years of age, went out on the back steps of his home and heard some one calling at the Myers home. Looking in that direction, he saw Mrs. Myers in the back door of her home lying on her side, her face turned toward McGowan's, and her body from her head to her waist being outside on the porch. Mrs. Myers called to the boy to tell his mother to come quick, that she wanted her. Mrs. McGowan immediately went over, saw Mrs. Myers lying on her side in the door and beckoning. Mrs. Myers was clad in a white night dress, the back door was open and the key was lying on the kitchen floor near to her side. Mrs. McGowan asked if she was sick, and she said, "Oh, we are all dead, the negroes have been here and Clarence is dead." The body of Clarence Myers was in a sitting position in the dining room against the east wall to the north end of the sideboard, and next the south side of the door leading into the kitchen, the limbs and feet extending across in the open door, so that the door which opened in and to the north could not have been opened nor shut without moving the body. Mrs. McGowan saw a portion of the body in the door of the dining room, and a lamp still burning low on the dining room table. She then returned to tell her husband, and had her son spread the news among the neighbors. Accompanied by her husband, she again went to the Myers home. In the meantime, Mrs. Carlson, living on the north of the McGowan's, seeing Mrs. Myers lying on the porch, had gone to her assistance and called her husband, who went over, picked Mrs. Myers up and carried her into the dining room, intending to place her in the bed in the room on the north, but seeing the broken and disordered condition of the bed, laid her down

on her back on the floor in the dining room, not far from the corpse of her husband; shortly afterwards she was taken into the bed room south of the kitchen and placed in bed in that room. She had spoken to Mrs. McGowan of being hurt by the negro burglar, whom she said had dragged her out into the kitchen, thrown her down and placed his knees upon her. Officer Bailey requested that Mrs. McGowan examine the defendant, and he and the other men in the room retired in order that such examination might be made. When Mrs. McGowan attempted to make the examination, the defendant would not permit it, saying she was not hurt. After the discovery of the murder, and the arrival of the officers, it was found that there was no evidence of an entrance having been made into the house or through any window or door, except that the back door of the kitchen was open when Mrs. Myers was discovered lying therein. No blood was found on the floor where the body was sitting. The body of Clarence Myers, when found, was in a suit of underwear, and upon an examination of the corpse by Dr. Boarman, deputy coroner, it was found that there was one large cut extending from the right side beyond the ear clear across the throat, across the shoulder to the left shoulder, and another cut going across the throat from ear to ear, severing the jugular vein and the carotid artery and into the windpipe; another one coming from the neck upward and met in the throat where these two wounds crossed; one cut from the left ear to the mouth and laying the cheek wide open; another cut on the left ear going out downward to the cut across the neck, across the collar bone crossways; it was above where the union suit was and extended straight across the body; there was one small cut on the left arm; one stab wound on the left arm. These first wounds described indicated that they were made by a sharp instrument, the other wounds were evidently made by a pointed instrument. There was a wound and a stab in the left arm,

and five stab wounds in the back, one about the should-
er blade and two below the shoulder blade and another
in between them.   There were two wounds evidently
made by a blunt instrument, one at the bridge of the
nose and the other in front, slightly over the left eye
near the center of the forehead; the wounds in the
throat were such as could be made by a razor and those
punctures such as could be made by a pair of sharp
pointed scissors.   The wound that caused the death
was the straight cut severing the jugular vein and the
carotid artery; that wound was such as to produce al-
most immediate death from bleeding.   *Rigor mortis*
had set in and the body was stiff and cold.

About four feet to the southwest and in front of
the sideboard was a pool of blood on the carpet, cover-
ing about the space covered by a rug or wash tub;
there was blood smeared on the north wall of the dining
room, on the dining room side of the door leading into
the kitchen, and on the north wall along and against
which that side of the door stood when open.   There
was a wash basin of bloody water found in the dining
room by the stove, and there were bloody finger prints
on the water bucket and on the handle of the dipper,
in the kitchen.   A calender hanging on the dining room
wall had been torn, part of it left on the wall, part on
the floor and part in the stove; it was smeared with
blood.   The north bedroom indicated that a desperate
struggle had there taken place.   The bed clothing was
bloody and disordered, and bed slats were broken and
strewn about the room.   The defendant said she had
been robbed and that her watch and jewelry had been
stolen, and a search of the house was made by the offi-
cers.   In the bottom drawer of a dresser in the north
bedroom a shaving set was found in a cigar box; a razor
was found in this box in a case, and blood was found
within the handle.   In the closet of the same room, cov-
ered with bed clothes and pillows, was found a number
7 1-8 size hat, wet and bloody.   This hat was afterwards

identified as the hat of Frank Hottman, as were also the bloody cuffs found in the same room with the cuff buttons taken out. In the kitchen window, behind a blood spot on the sash curtain, was found a pair of scissors with blood in the hinges; a bloody shirt, having the appearance of having been used to wipe up blood, was found hidden in the closet in the kitchen, and a wet bloody towel was found in the kitchen or dining room.

There was an organ in the parlor in which, after unscrewing and taking off the boards on the back, there was found in the bottom in one corner a jewelry box, containing defendant's watch and jewelry, consisting of some nine rings, which she had said had been stolen. The murdered man's clothing, containing his watch, twenty-five cents in change and some trinkets and tools used in his work, were found neatly folded on a chair in the dining room. The defendant's purse or chatelaine, containing some change and two dollars stained with blood, was found on the table in the same room. The foregoing articles were fully identified and offered in evidence. Dr. Burkhart, who had been sent for by the father of the defendant, examined her between eight and nine o'clock on the morning of that day, and found blood around her finger nails and on her hands, the latter having the appearance of having been recently washed.

After the homicide Frank Hottman first went to St. Joseph, then to his father's, where he obtained money, and fled to Walla Walla, Washington. At the latter place he was afterwards apprehended, made a confession, was brought back, tried and convicted for the murder of Clarence Myers. The defendant was taken in charge by the officer on the day of the homicide and detained two days and then released. She was again arrested on the 2nd day of July, 1904. Before her arrest on said second day of July, 1904, while making her home with her mother in Kansas City, the defendant

had two conversations with John Hottman, the father of Frank Hottman. After asking her mother to leave the room, the defendant asked Mr. Hottman if Frank had any ties, or collars or cuffs or shirts that looked like anything he had that he wore away from home. Mr. Hottman answered that he did not know, and the defendant said that if he had to burn them up. At the second conversation defendant asked Mr. Hottman where Frank was, and he told her and gave her the assumed name he was going under. He told her that Frank was geting out of money and wanted to come back home. The defendant said he must not come back home, and gave Mr. Hottman ten dollars to send to him, and said: ''You tell him to stay there, that he need not worry, that she would see that his board was paid, and for him to stay right where he was at.''

In November, after the defendant's arrest, a letter was received by Mrs. Hottman, Frank Hottman's mother, asking her to have her daughter Bertha see Frank and tell him to keep his mouth shut, that he was going against his best friend. This letter was identified as being in the handwriting of the defendant, marked Exhibit ''P,'' and was offered in evidence. Shortly before Frank Hottman's trial, Mary Schulz, a close friend of defendant who visited her at the jail, went to Higginsville and delivered to Mrs. Hottman a written statement purported to be the statement of the defendant concerning her relations with the Hottman family, and the murder of Clarence Myers, together with the following letter to Mr. and Mrs. Hottman, which statement and letter are as follows:

''EXHIBIT Q.'' ''*My statement*: Thay were allways goods friends of ours. we usta live by them at H. V. we were all most children rased together. After I came to Kansas City I all ways rote to them after I and Clarence was married one. or the other of the girls stade with us a good deal from three to four

198 Sup—16

weeks at a time and I told them Clarence send them money to come sometimes. That he likes them and wonted them to stay with me. He worked nights sometimes and we always got along good together. I and Clarence also the girls. thay asked me about Frank I said he was only at my house twist 2 after I was married, once before Christmas and once about two weeks before this troubel May 11 and I never had seen him sence. he stade all night at our house come up with some boys. come up on two o' clock train in afternoon and went back on the 8 next morning, I said I and him and Clarence went over to Mama that evening, stade till bed time. Thay asked me if I went to the show with him the first time he was here. I said twist but thay asked me if I ever rote to him. I sed, I rite. to the girls often but never rote to him once and a grate while, five to seven months and he when came up the first time he came to hunt work and that Clarence tried to get him work thay sed was Clarence jeolous I sed no. I said Mary usta stay with me. She was there a good deal when Frank was there. Mary and I and Frank was to one dance together. He was at our house about three weeks. Thay asked how old Frank was. I sed 19 or 20, and I would be 22 in October. I told them I visited H. V. about once a year. that you all seem allmost as near to me as my own folks. they asked about Frank; he is a good onnest boy he wooden harm any one. I sed I sent for the girls sometimes to come up and help me som. my full name Aggie Margaret and that toots was Mary name thay asked me why my watch being in the Orgin. I told them I always kept them there and money too that Bertie could tell them that I sed I never went to many dances. that when Nettie was there we went a time or to but Clarence was with us and I sed Berther was at my house after Frank was a stade all night. I sed I hading rote to Frank or heard from him sence. when his pa was at our house he tole me him and Frank was ditchen in the country. I

didant no Frank was going. he told me that thay a
litle stear was up at Higginsville."

"Exhibit Q." "Mr. and Mrs. Hottman; I rote
this statement down of mine as near as I remember it
and want you all to say the same as I do as near you
can for it will be better for us all to tell the same things.
it will help us all out. better than if we all could tell
defint stories. I want the two girls for my witness when
my time comes. I wood give any thing to see you all.
can't some of you come. well i will close with best
wishes and regards to all. as ever yours true friend."

This statement and letter were fully identified as
being in the handwriting of the defendant, and were
marked "Exhibit Q." and offered in evidence.

In addition to the foregoing facts and circum-
stances, Frank Hottman himself was a witness against
the defendant, and testified as to his relations with the
defendant, and in detail as to the conspiracy entered
into between himself and the defendant, at the sugges-
tion and instance of the latter, for the murder of her
husband. He recited not only the various meetings be-
tween them to plan and carry out this awful crime, but
also told the jury of the desperate struggle in which it
was successfully executed by himself and the faithless
wife. The direct testimony of Hottman as to the guilt
of the defendant but confirms and explains the circum-
stantial evidence which, independent of his evidence,
irresistibly leads to the same result.

1. Numerous errors are assigned for the reversal
of the judgment and sentence of the circuit court and
they will be considered and determined in the order of
their assignment in the brief of the defendant. The
first error alleged by the defendant is the refusal of the
circuit court to grant the defendant a continuance af-
ter both parties had announced ready for trial and af-
ter the jury had been impaneled on the grounds that the
names of the witnesses Frank Hottman, Nettie Hott-
man, Bertha Hottman, Ella Hottman and John Hott-

man were not endorsed upon the information until after the jury were sworn to try the case and because the defendant had not been otherwise notified that said witnesses were to be used against her until after the jury was sworn. The names of fifty-four witnesses were endorsed on the information, the record does not disclose what names of witnesses were endorsed when the information was filed in court, but it does show that forty-nine names were endorsed on the information by the prosecuting attorney by leave of the court on the 16th day of March, 1905. After the jury was sworn to try the case and before any evidence was offered, the prosecuting attorney by leave of the court over the objection of the defendant endorsed on the information the additional names of the witnesses Frank, Nettie, Bertha, Ella and John Hottman. After the opening statement of the prosecuting attorney, the defendant further objected to going to trial for the reason that the opening statement of the prosecuting attorney of Jackson county, Missouri, to the jury disclosed a state of facts which was to be sustained and proved only by said Hottmans and that the defendant was not prepared to meet their testimony. The court overruled the objection and the defendant excepted. The defendant afterward filed an affidavit in support of her exception and objection. The action of the court in permitting the State to call and the said witnesses to testify as witnesses for the State presents the first question for our determination.

The contention of the defendant, it will be observed, is based upon section 2517, Revised Statutes 1899, which provides: "When an indictment is found by the grand jury, the names of all the material witnesses must be endorsed upon the indictment; other witnesses may be subpoenaed or sworn by the State, but no continuance shall be granted to the State on account of the absence of any witness whose name is not thus endorsed on the indictment, unless upon the affidavit of

the prosecuting attorney showing good cause for such continuance.'' This statute has been before this court for construction many times. It was enacted for the first time in 1879 as section 1802. The common law did not require the names of any of the witnesses to be endorsed upon the indictment for any purpose connected with the trial. In Hill v. People, 26 Mich. 496, C. J. Christiancy said: ''But, as the witnesses who were to testify before the grand jury were sworn in open court before they were sent to the grand jury, a list of the witnesses intended to be examined before that jury was required to be endorsed on the back of the bill as drawn up to be laid before them. This was required for two purposes: first, that the crier or other officer whose duty it was to swear the witnesses might know who would be called and sworn, and that he might certify to their being sworn, which he did by adding after their names 'sworn in court;' and second, that the grand jury might know what witness to call and who had been sworn. In this mode, it is true, a defendant for a misdemeanor incidentally got the benefit of a list of the witnesses who had testified before the grand jury; because, in cases of misdemeanor, he was entitled to a copy of the indictment. But in cases of felony he failed to receive even this incidental benefit, as in such cases he was not entitled to a copy of the indictment.'' It follows that apart from the express or implied requirement of some statute, there is at common law no rule of evidence excluding witnesses whose names have not been furnished to the accused; nor is there any rule of preliminary procedure permitting the accused to obtain such a list by motion before trial. [3 Wigmore on Evidence, sec. 1850; 1 Bishop's New Crim. Proc., sec. 869a; Ballard v. State, 19 Neb. 609.] Our statute was evidently enacted to cure this defect in the common law. It was ruled in State v. Roy, 83 Mo. 268, and State v. Grady, 84 Mo. 220, that a complete failure to endorse the names of the material witnesses on an indictment was a

sufficient ground to quash it, but in State v. O'Day, 89 Mo. 559, it was held that where the names of some of the witnesses were endorsed upon the indictment, the presumption can and must be indulged that the indictment was found upon their evidence and that the grand jury in making the endorsement complied fully with the mandate of the statute. In State v. Steifel, 106 Mo. 1. c. 133, it was said, that the statute requiring the names of all material witnesses to be endorsed on the indictment is a most just and humane provision. It is right that, when a citizen's liberty or life is endangered, he should know the names of the witnesses by whom the charge is to be made good, but while this is true, it cannot be said that if the State discovers evidence that the grand jury could not obtain, the State shall not avail itself of this evidence if discovered before it closes its case. Indeed, section 4097, Revised Statutes 1889, now 2517, Revised Statutes 1899, expressly provides that "other witnesses may be subpoenaed or sworn by the State," and in State v. Henderson, 186 Mo. 1. c. 482, it was said, "We have not held in any case that, where the prosecuting attorney has endorsed the names of the witnesses for the State, the omission of one name would afford a ground for new trial on the mere objection that the name of such witness had not been endorsed on the indictment or information." And in the recent case of State v. Barrington, 198 Mo. 23, this same view was expressed. In the Henderson case and in the Barrington case, the view was expressed that there might be a case so flagrant as to amount to a surprise and upon a proper showing that the defendant if advised that the particular witness would be called against him, would have been able to impeach his character or contradict his testimony by other witnesses, and in such a case, the court by virtue of its inherent power and in furtherance of justice, could grant a new trial. But in this case, it is not contended that the prosecuting

attorney purposely refrained from endorsing the names of the witnesses on the information, in order to obtain an undue advantage of the defendant. Indeed the testimony of the proseuting attorney clearly negatives such a purpose. To hold that the State cannot use any witness other than those endorsed upon the indictment or information, would be to nullify that portion of the section which gives to the State the right to use other witnesses than those whose names are endorsed on the indictment, although the prosecuting attorney learned of their evidence after the finding of the indictment or the filing of the information, and although the common law made no such requirement. We are of the opinion that the circuit court committed no error in permitting the State to call and examine the witnesses above named who were not endorsed upon the information, and did not err in refusing to grant a continuance on the ground that other names were not endorsed on the information, and this ruling is applicable likewise to the witnesses Meinsen, McClaskey, Prewitt, Bowen and Stohl, whose names also were not endorsed on the information.

2. It is next insisted that the court erred in overruling the defendant's challenge to the jurors Lancaster, Golden, Cossett, Borgnier, Wharton, Miller, Soper and Capps for the reason that the said jurors on their *voir dire* examination testified that they had formed opinions as to the guilt or innocence of the defendant from having read a copy of the confession of Frank Hottman published in the Kansas City newspapers. To this assignment of error the State makes two answers: first, no specific ground of challenge was stated by the defendant to either or all of said jurors; and, second, that the jurors were not incompetent because they had formed an opinion from the reading of the newspaper report of the Hottman trial, and what purported to be Hottman's confession published in the newspapers. The record discloses that upon the close of the

examination of each of the said jurors, the defendant made the general challenge, "Defendant challenged this juror;" no specific ground of challenge was given in either case. Were the challenges sufficient to preserve the error now complained of for review by this court? In Kansas City v. Smart, 128 Mo. l. c. 290, it was said: "The grounds of challenge to a juror must be stated when it is offered and tested on his *voir dire*. The trial court is entitled to know the reason for the challenge. [State v. Brownfield, 83 Mo. 453, 454; Thompson & Merriam on Juries, sec. 253, and cases cited; 1 Thompson on Trials, sec. 98.]" In State v. Taylor, 134 Mo. 142, Judge SHERWOOD, speaking for this court, reviewed the authorities on this point and said:

"The defendants, of course, were entitled to a full and competent panel of forty men before announcing their final challenges, but in reaching this stage of the proceedings it became necessary to make what might be termed intermediary challenges. In making such preliminary challenges, that is, challenges for cause, this formula was observed at the close of the examination of each venireman: 'Counsel for defendants objected to this juror as disqualified and not qualified to sit as a competent juror in this cause, and challenged said juror for cause. Objection and challenge overruled, to which ruling defendant excepted.' Nothing is better settled than that challenges for cause must be specifically stated. The particular cause must be set forth. [People v. Reynolds, 16 Cal. 128; Mann v. Glover, 14 N. J. L. 195; Powers v. Presgroves, 38 Miss. 227; Southern Pacific Co. v. Rauh, 49 Fed. 696; Drake v. State, 20 Atl. 747; 2 Elliott's Gen. Prac., sec. 530, and other cases there cited.] The facts constituting the cause of complaint were not given in this instance; the challenge simply amounted to the statement of a legal conclusion. The rule should be the same here as it is where general objections are taken to the evidence,

that it is incompetent, immaterial, etc., and where it is held that general objections amount to nothing more than saying, 'I object.' Indeed, there seem to be more cogent reasons why specific objections should be urged in a case of this sort, where the question is as to the admission of a juryman, then where it is as to the admission of a piece of evidence. At any rate, in either case, fairness to the court and to adverse counsel alike demand the grounds of the challenge for cause to be particularly set forth."

The doctrine announced in that case on this point was reaffirmed in State v. Reed, 137 Mo. 1. c. 132; State v. McGinnis, 158 Mo. 1. c. 118; and in State v. Evans, 161 Mo. 1. c. 108.

Counsel for the defendant, however, insists that in this case the ground of the challenge was so apparent to the court and the opposite counsel that they could not have been misled as to the ground of the challenge. We are unable to concur in this view. These jurors had been fully examined as to their competency, and among other things as to their opinions formed from reading newspaper reports. If the objection was intended to be based specifically upon the ground of opinions formed or expressed, it should have been so stated and the matter properly preserved for our review.

Moreover, we are of the opinion that the jurors were not disqualified because they had formed an opinion from reading the newspaper reports of the Hottman trial and what purported to be Hottman's confession, because each one of said jurors testified that he could sit as a juror in this case and be governed solely by the evidence and render an impartial verdict, notwithstanding his opinion formed from the reading of such newspaper reports and such opinion as he had was based entirely upon the newspaper reports. Section 2616, Revised Statutes 1899, provides: "It shall be a good cause of challenge to a juror that he has formed or delivered an opinion on the

issue, or any material fact to be tried, but if it appear that such an opinion is founded only on rumor and newspaper reports, and not such as to prejudice or bias the mind of the juror, he may be sworn.'' It is a well-settled law in this State that a person otherwise qualified to sit as a juror in a criminal case is not disqualified by reason of having formed an opinion as to the guilt or innocence of the accused, from reading partial newspaper accounts of the homicide, or from rumor when he states on his *voir dire* that he can give the defendant a fair and impartial trial. [State v. Reed, 137 Mo. 132, and State v. Forsha, 190 Mo. l. c. 323, 324.] In the last-cited case, certain of the jurors upon the *voir dire* examination answered that they had read a report of the Bailey trial, in which Bailey had been tried for the same murder, and that they had read what purported to be the evidence on that trial, including the testimony of the Biggs woman, who was present with Bailey and Forsha when the murder was committed, and from such reading had formed an opinon as to the guilt of the defendant, but that they could give the defendant a fair and impartial trial notwithstanding such an opinion, and it was ruled that they were not disqualified. The grounds of disqualification in that case were almost identical with those urged in this, and we do not think rendered the jurors incompetent.

The extra-judicial confession of Frank Hottman, published in the newspaper, only purported to be a fragment of the evidence which would be admitted against Hottman, an unsworn statement by him, and it does not bring it within the rule in State v. Culler, 82 Mo. 623, in which it was held that one who has read the evidence taken before the coroner in a case of homicide either as originally written or as printed in the newspaper, or who has read the evidence in a criminal case on preliminary examination before a justice of the peace and formed an opinion therefrom, in either case is disqualified from serving as a juror in the trial of such a

cause.  Neither does it fall within the rule announced
in State v. Foley, 144 Mo. 600, in which it was held that
where the jurors have been personally present in court
on a former trial of the same defendant on the same
indictment, and heard the witnesses detail their evi-
dence under oath, they are incompetent to sit as jurors.
The statement offered in evidence to show the disquali-
fication of these jurors was simply a statement by the
newspaper of what purported to be the unsworn con-
fession of Hottman made at Walla Walla in the State
of Washington, and which the paper stated would be
used against him on his trial.  No effort was made to
show that the newspaper reports of the Hottman trial
were correct reports of the evidence taken on that trial,
nor that the reports themselves were offered in evi-
dence at the time of the challenge of these jurors.  It
must, therefore, be held that even if the challenges had
been properly made, and we hold that they were not,
still the reading of these newspaper reports and the
purported confession of Hottman did not under the
decision of this court render the jurors incompetent
to try the cause.  [State v. Walton, 74 Mo. 275; State
v. Hopkirk, 84 Mo. 283; State v. Davis, 29 Mo. 397;
State v. Forsha, 190 Mo. 296.]

3.  Defendant assigns as error the action of the
circuit court in permitting Frank Hottman to testify
over her objection, because it appeared by the prelim-
inary examination of the witness that he was an accom-
plice in the crime for which defendant was on trial,
and had himself been convicted of murder in the first
degree on the information charging him with the same
crime, and for that reason was incompetent as a wit-
ness.  In support of this contention we are cited to the
case of State v. Miller, 100 Mo. 606. That case, however,
is no authority for the proposition that an accomplice
is incompetent to testify against another charged with
the same crime.  It was only held in that case by Judge
SHERWOOD that when an accomplice made an agreement

with the prosecuting attorney that if that official would accept a plea from him of murder in the second degree, and would *nolle* several other indictments pending against him, he would testify against the defendant, such a bargain rendered him incompetent as a witness. By reference to that case, it will be seen that the other judges concurred merely in the result of the opinion except Judge BLACK who dissented. But the facts of that case, even accepting Judge SHERWOOD's view, are wholly unlike those appearing in this record and furnish no ground for excluding the witness. When the witness Hottman was offered, and it appeared in evidence that he had been convicted of the murder of Clarence Myers, and that his case was then pending on motion for new trial, it appeared that no promise was made by the prosecuting attorney to induce him to testify against the defendant, but he was persuaded to do so by his mother in a hope that clemency might be extended to him. He was charged separately from the defendant in this case. It has been decided by this court that an accomplice not jointly prosecuted with the defendant is a competent witness for the State. [State v. Umble, 115 Mo. 461; State v. Walker, 98 Mo. 95; Wharton's Criminal Evidence, sec. 439; McKenzie v. State, 24 Ark. 636; 1 Bishop's Crim. Proc. (3 Ed.), sec. 1167; State v. Riney, 137 Mo. l. c. 104.]

But this proposition, it would seem, is set at rest by our own statute, section 4680, Revised Statutes 1899, which provides: "Any person who has been convicted of a criminal offense is, notwithstanding, a competent witness." In the case of State v. Minor, 117 Mo. 302, this court held that an accomplice jointly indicted with the defendant on trial was, after his own conviction, a competent witness for the State against his co-defendant on trial. The mere fact, as was said in State v. Riney, that the witness expected a lighter sentence for his own confessed complicity in the crime because he had become a witness for the State, did not affect his

competency though it did his credibility.    [State v. Stewart, 142 Mo. l. c. 417; State v. Black, 143 Mo. l. c. 172.]

4.  It is further urged as a ground for reversing the judgment that the circuit court erred in permitting witnesses to testify as to the acts and declarations of the witness Frank Hottman after the consummation of the crime.  The law is well established, of course, that the declarations of confederates against each other when the enterprise is at an end, whether by accomplishment or abandonment, are incompetent to affect their co-conspirators, but it is equally well established by decisions of this court that an appellate court will not pass upon the admissibility of evidence when the record shows that it was received without objection. [State v. McCollum, 119 Mo. l. c. 474; State v. Lett, 85 Mo. 52; State v. Foster, 115 Mo. 448.]    In their brief and argument learned counsel for the defendant do not point out what witness or witnesses were allowed to testify to acts and declarations of Hottman after the consummation of the crime, but counsel in their brief and argument say in support of this point, that, the court erred in permitting Hottman to testify to his acts and declarations after the consummation of the crime.  An examination of the testimony of Hottman discloses that after he had testified to the participation of himself and the defendant in the murder of Clarence Myers, the husband of the defendant, he detailed conversations with the defendant in which she stated to him that she was sorry she had led him into the crime and would meet him in the near future.  And then detailed his movements in going to St. Joseph and thence to Walla Walla in the State of Washington, and while at Walla Walla he was arrested by officer Dave Oldham, a member of the Kansas City police force, and that he made a statement of his connection with the affair to the officer at Walla Walla.  No objections were interposed by counsel for the defendant to any of these

statements except that in regard to his confession, which upon objection was stricken out by the court. On cross-examination of Hottman, however, by defendant's counsel, Hottman again repeated the making of the confession at Walla Walla implicating himself and Mrs. Myers, the defendant, in the murder of her husband, and of his return to Kansas City, and the making of another confession at the Midland Hotel on the night after his return from Walla Walla, so that it really appears that all the statements as to his movements and actions after the consummation of the crime were brought out by the defendant herself, and without any objection thereto on the part of her counsel. In the course of this cross-examination, the written confession or statement made at the Midland Hotel by Hottman was used by counsel for defendant as the basis of his cross-examination and from time to time counsel read portions of that statement to the witness Hottman and asked him if he made those statements. At one time, counsel handed the statement or confession to the witness and asked him to identify it. The witness identified the signature as his own. He was also shown the statement made by him to Mr. Oldham at Walla Walla, and the statement was marked "Exhibit M." Excerpts from that statement were also read to the witness and he was asked if he used the expressions therein. And he was fully cross-examined upon the said confession. We have been unable to find where any objection was made by the defendant at the time to any of the evidence as to the acts and declarations of Frank Hottman after the consummation of the crime except as to the admission of the confession made at Walla Walla, and the admission of that confession in evidence must now be considered.

As already stated, the witness Hottman was cross-examined by the defendant's counsel as to this confession made at Walla Walla, and parts of the confession were read to the jury by counsel for the defendant for

the purpose of discrediting him.  When the statement
of the witness Hottman made at Walla Walla was of-
fered in evidence, the defendant objected to the intro-
duction of the statement, for the reason that it was in-
competent, irrelevant, and immaterial.  Thereupon the
court in ruling upon this point said, "The defendant
has asked questions about this statement, and if they
did not want it in evidence, the witness should not have
been asked about it.  The objection will be overruled,"
and the defendant then excepted to the ruling of the
court, and it is this action of the court that is now
before us for review.  The witness Hottman having
been cross-examined as to this confession and parts
of it read to the jury by counsel for the defendant for
the purpose of discrediting the witness, the question
arises, was the State not entitled to the whole confes-
sion?  In the case of the State v. Phillips & Ross, 24
Mo. l. c. 485, Judge Scott, speaking for this court, said:
"Another alleged error of which complaint is made is,
that the court permitted the State to read in rebuttal
the whole of the evidence of the witness Shultz, taken
before the coroner and magistrate.  Shultz, it appears,
was examined as a witness for the State.  The de-
fendants afterwards, for the purpose of discrediting
the witness, read portions of his depositions taken
before the magistrate and coroner.  The State then read
the whole of these depositions.  We see no error in
this course.  As the defendants read parts of the
depositions with the view to contradicting the witness,
the prosecution was entitled to read the whole of them,
in order to show his consistency.  [Harrison v. Rowan,
3 Wash. C. C. 580; Temperley v. Scott, 5 Car. & Payne
341; Cowan & Hill's notes, 934, 935.]"  In Prewitt v.
Martin, 59 Mo. 325, the point was made that the court
erred in permitting the whole of plaintiff's deposition
to be read to the jury, and was not warranted by the
rule laid down in State v. Phillips & Ross, 24 Mo. 475.
This court, in speaking of that objection, said: "In the

case at bar, defendant's counsel contends that he read no portion of plaintiff's deposition to the jury, but only read extracts to the witness, and asked her whether she swore to the same. We do not think the rule in regard to the cross-examination of witnesses as to contradictory written statements can be evaded in this way. A deposition stands upon precisely the same footing, in this regard, as other written documents. And the rule is, in impeaching the credit of a witness by proof of contradictory written statements, that the writing, if in existence, must be produced and shown to the witness, and if it be admitted to be his, counsel cannot inquire of the witness whether or not certain statements are in the instrument, but the instrument itself must be read as evidence. The deposition in this case, having been shown to be that of the plaintiff, it was itself the best evidence as to whether it contained contradictory statements, and should have been read to the jury; and the reading of a portion of it, in the presence or hearing of the jury, was evidently treated by the court as the reading of the same to the jury, and plaintiff's counsel were properly allowed to read the whole deposition. [1 Greenleaf's Ev., secs. 463 and 465.]'' The same ruling was repeated in State v. Talbott, 73 Mo. l. c. 358, and Wilkerson v. Eilers, 114 Mo. l. c. 251, 252. It must be held that, inasmuch as the defendant insisted upon reading portions of the alleged confession of the witness and cross-examining him thereon, the court committed no error in allowing the State to read the whole document in order to show the consistency of the witness.

5. Again, error is predicated on the admission in evidence of a letter and paper received by the witness, Mrs. Hottman, from Mary Shulz, on the ground that the said letter and paper was not shown to have been written by the defendant, and the matter therein being otherwise immaterial and irrelevant. The writing and the letter alluded to in this exception are marked ''Ex-

hibit Q" found in the statement of the case, one of them being entitled, "My Statement." These papers were identified as being in the handwriting of the defendant. Mary Shulz, who delivered the same to Mrs. Hottman, the mother of Frank Hottman, had formerly resided at Higginsville, but was then living in Kansas City, and was a friend of the defendant and visited her every day at the jail. A short time before Frank Hottman's trial, Mary Shulz went to Higginsville on Saturday night and delivered these papers to Mrs. Hottman, and returned to Kansas City the next morning. The document entitled "My Statement" and the letter were clearly material evidence, and having been shown to have been in the handwriting of the defendant they were properly admitted in evidence. The mere fact that the defendant's name was not signed to either of the papers did not affect their admissibility. [State v. Winningham, 124 Mo. 425.]

6. Another ground of error assigned by the defendant is that the court refused to grant a new trial for the reason that it became a question in the trial of the case as to whether or not certain letters and papers were in the handwriting of the defendant and one of the jurors testified on his *voir dire* that he could not read or write. This juror was Lafayette Thomas. He stated on his *voir dire* that he was no scholar; that he could only write his own name. He was not challenged by the defendant. This assignment of error is based upon section 4679, Revised Statutes 1899, which provides: "Comparison of a disputed writing with any writing proved to the satisfaction of the judge to be genuine shall be permitted to be made by witnesses, and such writings and the evidence of witnesses respecting the same may be submitted to the court and jury as evidence of the genuineness or otherwise of the writing in dispute." And we are cited to the case of the State v. Thompson, 141 Mo. 408, construing that section. The

198 Sup—17

reading of that decision will clearly demonstrate that it has no bearing whatever upon the proposition now urged by the defendant. Section 3763, Revised Statutes 1899, provides: "No exception to a juror on account of his citizenship, non-residence, state or age or other legal disability shall be allowed after the jury is sworn." Neither the common law nor any statute of this State requires ability to read and write as a qualification for jury service, and this exception must be disallowed.

7. The information itself is assailed as insufficient on the ground that the assault was alleged to have been made with a deadly weapon, a certain club or bludgeon, a certain razor, and a certain pair of scissors, it not being stated in the information which of said weapons was the deadly weapon with which the murder was committed. In answer to this contention, it suffices to say, in the first place, that it was not at all necessary to allege in the information that the weapon with which the assault was made was a deadly weapon. This was decided in State v. McDaniel, 94 Mo. 301; State v. Hyland, 144 Mo. 302; State v. Bowles, 146 Mo. 6; 2 Bishop's Crim. Proc., sec. 514; Jeffries v. Com., 84 Ky. 237. As to the other contention, that it was not stated with which of the deadly weapons the crime was committed, the charge is that it was committed with all of them, and it is well settled in this State that an assault may be charged to have been with different kinds of weapons. [State v. McDonald, 67 Mo. 13; State v. Blan, 69 Mo. l. c. 319.]

8. Among other objections to the testimony, there is an assignment of error that the court improperly permitted the witness Stohl to testify that he saw the defendant and Frank Hottman together at Higginsville after the killing of Clarence Myers. An investigation of the record on this point discloses that the witness without objection testified to having seen the defendant get off of the train about 8 o'clock one night, shortly

after the killing of Myers, at Higginsville, and when she did so, Frank Hottman and his two sisters met her there, and the defendant stepped up and took the arm of Hottman, and they went across the street; this he thought was the third or fourth day after the murder of Clarence Myers. He was then asked this question, "When did you next see him there?" To this the defendant objected that it was after the killing and no part of the *res gestae.* The court ruled he could answer the question, and he answered, "I did not see him any more after that." It is obvious that the ruling of the court was in no manner prejudicial to the defendant as the witness did not see Hottman any more after that night, and the fact that the defendant and Hottman were together in Higginsville after the murder was stated without any objection or exception.

9. It is also complained that the court erred in permitting the witness Nettie Hottman to answer the question, "How often did she write to him?" meaning Frank Hottman. To this question the witness answered, "Well, she wrote to him a good deal, I do not know." No objection was made to the question itself, but after it was answered, counsel for the defendant moved the court to strike out the answer for the reason that it was a mere conclusion of the witness and not a statement of the facts, and this the court declined to do. We think there was no merit in the motion; it was a statement of fact to the best knowledge of the defendant. It was not necessary that she should specify the exact number of letters, or that she should be expected to be able to state the particular number.

Another question objected to was, "How long after Clarence was killed was it before you burned up the letters of this defendant?" To understand the objection to this question it should be considered that the prosecuting attorney was endeavoring at that time to show hat the witness Nettie Hottman was familiar with the handwriting of the defendant and had corresponded

with her herself, and that a bundle of letters written to her sister Bertie Hottman was at the Hottman home at Higginsville, after the killing of Clarence Myers. The prosecuting attorney had inquired of the witness where those letters were, and she had answered that they were burned up, and then the question came, "How long after Clarence was killed was it before you burned up the letters of this defendant?" To this question the defendant objected, for the reason that it was irrelevant and immaterial, and the objection was overruled. We think it was entirely competent to show that the witness was familiar with the handwriting of the defendant. And it was entirely competent to prove what had become of the letters in accounting for their absence, as the letters would be competent evidence to submit to the jury for the purpose of comparison with the other papers that the State purposed to show were written by the defendant, which has already been discussed hereinbefore.

Defendant also complained that the court permitted the witness to testify that the defendant did not attend her husband's funeral. The conduct of the defendant in that regard was a circumstance for the consideration of the jury, and at any rate the admission of the evidence constitutes no reversible error.

10. Again, it is insisted that the court erred in permitting Frank Hottman to testify what wages he got at the Confederate Home. As to this question no objection was made until after the question had been answered, and then only that it was incompetent, irrelevant and immaterial. No motion was made to strike out the answer, and at any rate there is no merit in the point.

Objections were likewise made to the question to Frank Hottman, why he came to Kansas City, and if the defendant had written him to come. The theory of the State throughout the cause was that a conspiracy had been entered into between the defendant and Frank

Hottman to murder Clarence Myers, and that in pursuance of this conspiracy, the defendant had furnished Hottman with money and had written to him to come to Kansas City, and these questions were propounded to the witness to prove these facts. They were entirely competent.

11. It is now urged, for the first time, that the call for a special term of the court at which the defendant was tried was not in compliance with section 1606, Revised Statutes 1899, which provides: "Whenever any person charged with an offense shall be confined in jail two months before the regular term of court, in which he is to be tried, the jailor shall, without delay, inform the judge of such court thereof, who, if he shall be satisfied that a trial of such persons so confined can be had thereat, and the public good require, shall call a special term of the court for the trial of such prisoner." The record recites that on the 27th of April, 1905, the clerk of the circuit court of Clay county received from the judge of the 7th judicial circuit of the State of Missouri, and ex-officio judge of the circuit court of Clay county, the following order: "Having been notified on the 3rd day of April, 1905, by Andrew P. Wymore, sheriff of said county of Clay, and keeper of the common jail of said county, as provided by section 1606, Revised Statutes of Missouri of 1899, that one Maggie Myers *alias* Aggie Myers, charged with murder in the first degree, is in his custody and confined in the said jail awaiting trial and the undersigned judge of said court being satisfied that said Maggie Myers *alias* Aggie Myers can be tried thereat and that the public good requires it, it is therefore ordered by the undersigned judge of said court that a special term of the circuit court of said Clay county, Missouri, be begun and held in the city of Liberty in said Clay county, on Monday, 5th day of June, 1905, at 9 o'clock a. m., for the trial of said Maggie Myers *alias* Aggie Myers. And it is further ordered that the clerk of the circuit court

of said Clay county spread this order of record in his office and make duly certified copy thereof at once and deliver the same to the said Andrew P. Wymore, sheriff and jailor as aforesaid, to be served on Ralph Hughes, prosecuting attorney of said county, and on the said Maggie Myers *alias* Aggie Myers, not less than ten days before the commencement of said special term of court. Given under my hand at chambers at Gallatin, Missouri, this 22 day of April, 1905. Joshua W. Alexander, Judge of the 7th judicial circuit of the State of Missouri, and ex-officio judge of the circuit court of Clay county, Missouri.'' Thereupon the clerk made out the certified copies of said order for service on Ralph Hughes, the prosecuting attorney of said county, and on the said Aggie Myers, and delivered the same to Andrew P. Wymore, sheriff of the county of Clay. The sheriff made due return that he had executed this order made by Judge Alexander by delivering a copy to the prosecuting attorney on the 27th of April, 1905, and delivering a certified copy thereof to said Maggie Myers on the 3rd day of May, 1905.

As already recited in the statement of this cause, the prosecuting attorney of Jackson county began this prosecution by filing the information in this cause in the criminal court of Jackson county at Kansas City, and the defendant was duly arraigned and pleaded not guilty in said Jackson County Criminal Court. Afterwards upon the application of the defendant and on the 22nd day of March, 1905, the criminal court of Jackson county granted a change of venue to Clay county, Missouri, and directed a copy of the record to be served on the circuit court of Clay county, and ordered that the marshal of Jackson county remove the body of the defendant Maggie Myers to the jail of Clay county, Missouri, and deliver her into the custody of the sheriff of Clay county, Missouri. The ground upon which the call for the special term of the court of Clay county, at which defendant was tried, is now challenged, is that

the return of the sheriff of the notice required to be served on the prisoner as required by section 1607, Revised Statutes 1899, shows that the prisoner was confined in the jail of Jackson county and not in the jail of Clay county. As already said, this proposition was never mooted in the circuit court of Clay county at any time either by motion, suggestion or as a ground for continuance prior to the commencement of the trial, nor in either the motion for new trial or in arrest of judgment. There is absolutely no evidence whatever to contradict the notice given by the sheriff to Judge Alexander prior to the making of the call for the special term, that the said Maggie Myers *alias* Aggie Myers was in his custody and confined in the jail of Clay county at the time the order was made. It is obvious that the mere fact that the prisoner was in the Jackson county jail on the 3rd of May, 1905, in no manner contradicts the statement of the sheriff and jailor to Judge Alexander, that on the 3rd of April the prisoner was confined in the jail of Clay county awaiting her trial, nor that she was not there on the 27th of April when the judge made his order calling the special term. In the absence of any such showing every presumption will be indulged in favor of the correctness of the action of Judge Alexander who was the judge of the court of general jurisdiction. By section 8125, Revised Statutes 1899, the sheriff of any county in this State is authorized, when the jail of such county shall be insufficient, to commit any person or persons in his custody, either on civil or criminal process, to the nearest jail of some other county, and for aught that appears in this record, the sheriff of Clay county may have committed the defendant to the jail of Jackson county by virtue of that section, and under the law the prisoner remained within the jurisdiction of the circuit court of Clay county, and she was subject to the orders of the judge of the circuit court of Clay county. This point

must accordingly be ruled against the contention of the defendant.

12. In her supplemental brief, the defendant challenges the third instruction given by the court. That instruction is as follows:

"The court instructs the jury that he who wilfully, that is, intentionally, uses upon another at some vital part a deadly weapon, such as a club or bludgeon, razor or scissors, must in the absence of qualifying facts, be presumed to know that the effect is likely to be death, and knowing this, must be presumed to intend the death, which is the probable and ordinary consequence of such an act, and if such deadly weapon is used without just cause or provocation, he must be presumed to do it wickedly or from a bad heart. If, therefore, the jury believe from the evidence that defendant, either acting alone or acting in concert with another, took the life of Clarence Myers by beating, bruising, cutting, stabbing and wounding him in a vital part with a club or bludgeon, razor or scissors, and that such club or bludgeon, razor or scissors was a deadly weapon, with a manifest design to use such weapon upon him, and with sufficient time to deliberate and fully form the conscious purpose to kill, without sufficient reason or cause or provocation, then such killing is murder in the first degree; and while it devolves upon the State to prove willfulness, deliberation, premeditation and malice aforethought, all of which are necessary to constitute murder in the first degree, yet these need not be proven by direct evidence, but may be deduced from all the facts and circumstances attending the killing, and if the jury can satisfactorily and reasonably infer their existence from all the evidence, they will be warranted in finding the defendant guilty of murder in the first degree."

In connection with the giving of this instruction, the court gave instructions 1 and 2, which required the jury to find that at the county of Jackson and State of

Missouri before the filing of the information herein, the defendant either alone or acting in concert with another did wilfully, deliberately and premeditatedly and of her malice aforethought beat, bruise, cut, stab or wound one Clarence Myers with a club or bludgeon, razor or scissors, and that the said club or bludgeon, razor or scissors, and each of them were then and there deadly weapons and did unlawfully inflict upon him, the said Clarence Myers, a mortal wound, from which said mortal wound, the said Clarence Myers within one year thereafter in the county of Jackson did die, then they would find the defendant guilty of murder in the first degree. And then in the 2nd instruction the court fully defined the words "wilful, deliberate, premeditated, and malice aforethought" as they have often been defined and approved by this court.

There is no merit in the objection to the 3rd instruction that the court assumed that the weapons were deadly. It is plain from all the instructions that the court submitted to the jury the question whether they were deadly weapons. The instruction in other respects is a correct declaration of the law as to what constitutes murder in the first degree. It has received the approval of this court substantially in this form for many years. [State v. Lane, 64 Mo. 319; State v. Hudspeth, 150 Mo. 12, 159 Mo. 178; State v. Cushenberry, 157 Mo. 168; State v. Harrod, 102 Mo. 590; State v. Frazier, 137 Mo. 317.]

We have thus carefully investigated all the alleged errors pointed out by the defendant's counsel in their briefs and oral arguments, and in our opinion neither singly nor collectively do they afford any sufficient reason for reversing the judgment of the circuit court. The case is the most serious that can ever be submitted to a human tribunal. The issue involves the life of a human being, and impressed with this fact, we have endeavored to give the case our most careful consideration. It is not suggested that the evidence if believed

by the jury was not amply sufficient to sustain a conviction of murder in the first degree, and if it were so suggested, the answer must be that the testimony tended to show the cold-blooded, deliberate and premeditated murder of an unsuspecting and unoffending husband by his own wife and a guilty paramour. The judgment of the circuit court must be and is affirmed, and the sentence which the law pronounces is directed to be carried into execution.

*Burgess, P. J.,* and *Fox, J.,* concur.