# MICHAEL OHLMANN, Appellant, v. CLARKSON SAW MILL COMPANY et al.

### Division One, July 1, 1909.

1. **ORDER OF PUBLICATION: Abbreviated Christian Name:** Mike Ohlman for Michael Ohlmann. In notice by publication the defendant should be accurately designated by his true name. And where the patentee and record owner was Michael Ohlmann, and as a non-resident he was sued for back taxes as "Mike Ohlman," and was so described in the petition, taxbill, order of publication and judgment, the court did not have jurisdiction, and the judgment and sale were void. And in this connection it is significant (1) that Ohlmann is German, and that "Mike" has scant application to Germans and scant usage among them; and (2) that there is no evidence that Michael Ohlmann was known anywhere as "Mike" Ohlman.

2. ———: ———: "Mike" is not an abbreviation at all, accurately speaking. It is a nickname, a corruption, a mere diminutive— a name given in derision or sportive familiarity.

Appeal from Reynolds Circuit Court.—*Hon. Jos. J. Williams,* Judge.

REVERSED AND REMANDED (*with directions*).

*R. I. January, Arthur T. Brewster* and *Sam. M. Brewster* for appellant.

The court erred in admitting the sheriff's tax deed in evidence for the following reasons: (a) Because the judgment in the tax proceeding on which it depends for its validity was not against the record owner of the land. (b) Because it purported on its face to convey the interest of "Mike Ohlman" when "Michael Ohlman" was shown by the evidence to be the record owner of the land on the date of the institution of the tax proceedings. (c) Because the petition, taxbill, order of publication and judgment in the tax proceedings on which said deed is based named the defendant therein as "Mike Ohlman" which is an insufficient petition and order of publication to give the court jurisdiction to render a judgment against, or the sheriff valid authority to sell, the land of "Michael Ohlman." R. S. 1899, sec. 9303; Simonson v. Dolan, 114 Mo. 176; Burkham v. Manewall, 195 Mo. 500; Turner v. Gregory, 151 Mo. 100; Becker v. Ins. Co., 68 Ill. 412; Maynohan v. People, 3 Colo. 367; McGill v. Weil, 10 N. Y. Supp. 246.

*Dinning & Dinning* for respondents.

At the trial appellant relied solely upon the legal proposition that a suit for taxes brought against Mike Ohlman would give the court no jurisdiction against Michael Ohlman, nor would the court have jurisdiction to render a judgment for taxes against the land in question the title to which stood in and remained in Michael Ohlman. In this opinion and position the appellant was in error. Fenton v. Perkins, 3 Mo. 145; Weaver v. McElhenon, 13 Mo. 91; 21 Am. and Eng. Ency. Law (2. Ed.), 309; 17 Ib. 897; Mosley v. Matson, 37 Ala. 216; Goodall v. Hall, 112 Ga. 436; Jones' Estate, 27 Pa. St. 338; Rupert v. Penner, 35 Neb. 687; McGregor v. Balch, 17 Vt. 562; Sparks v. Sparks,

51 Kan. 195; People v. Ferguson, 8 Cow. (N. Y.) 106; People v. Tisdale, 1 Dougl. (Mich.) 59; Com. v. O'Baldwin, 103 Mass. 210; Walter v. State, 105 Ind. 589; Sowl v. Sowl, 10 Pick. (Mass.) 376; Com. v. Terry, 114 Mass. 263; Shelburn v. Rochester, 1 Pick. (Mass.) 470; People v. Armstrong, 114 Cal. 570; Ogden v. Gibbons, 5 N. J. L. 598; Trimbill v. State, 4 Blackf. (Ind.) 438; State v. Johnson, 67 N. C. 57.

LAMM, P. J.—Suit under section 650, Revised Statutes 1899. Plaintiff, a resident of Illinois, sued the Clarkson Saw Mill Company (joining divers other parties as codefendants) in the Reynolds Circuit Court to quiet title to the south half of section 35, township 32, range 2—the sawmill company alone making defense.

Judgment went in favor of that defendant on the southwest quarter of said section and, as to the southeast quarter, dismissing the cause. Plaintiff comes here.

The petition alleges, *inter alia*, that the sawmill company claims under a quitclaim deed from certain Cartys and others. The answer of that company was a general denial, barring an admission that it held an adverse claim to the southwest quarter and an allegation that it owned the southwest quarter by a fee simple title. It pleads a misjoinder of causes of action, admits the quitclaim deed by the Cartys, but denies it makes any claim to the southeast quarter under that deed.

Plaintiff introduced a patent from the United States to the south half of said section 35, of date September 1, 1859, recorded December 7, 1866. This patent runs to "Michael Ohlmann."

Defendant, over objection and exceptions saved, introduced a tax deed from Harrison, sheriff of Reynolds county, dated May 29, 1879, purporting to convey

the south half of section 35 to G. J. Carty. Sundry objections were made below to this tax deed and are now pressed. But unless it is necessary to develop and determine other phases of the case, we need heed but one, viz.: that the deed does not purport to convey the title of Michael Ohlmann, patentee, but runs against the title of "Mike Ohlman." Carty's bid was $16 for the half section and the land was knocked down to him for that sum. Whether this sheriff's deed was put of record does not appear.

Supplementing that deed with evidence that certain Cartys and others were the sole heirs of G. J. Carty, the sawmill company introduced a quitclaim deed of date September 5, 1903, conveying to it the title of said heirs in the *locus*.

Thereupon plaintiff read into the record the petition, authenticated taxbill, made a part thereof, order of publication and judgment in the tax suit—from all which it appears that the suit was instituted in 1878 in the name of the State to the use of Carter, collector of revenue in Reynolds county, against "Mike Ohlman" as owner of a certain nine hundred and sixty acres of land, including said south half, for delinquent taxes; that the back taxbill certified the owner's name to be "Mike Ohlman;" and that the order of publication ran against "Mike Ohlman" as a non-resident. The judgment followed the petition, back taxbill and order of publication in that particular.

No possession is alleged or proved by either side.

Waiving, for the present, all other questions raised on the record (some of them of no little gravity) we confront the first, viz.: Did Michael Ohlmann's title as patentee pass by a sheriff's deed purporting to convey the title of "Mike Ohlman," when the deed is based on a judgment for taxes on constructive service with no appearance by defendant—the petition,

222 Sup— 5

order of publication and judgment describing the owner as "Mike Ohlman?"

(a) The question goes to jurisdiction and due process of law. No man may judicially lose his property without his day in court. A day in court proceeds on notice. So, due process of law and jurisdiction depend on notice. By Revised Statutes, section 9303, it is ordained that tax suits shall be brought "against the owner of the property." By this is meant the record owner unless the fact is known, or the purchaser have notice that the record owner is not the true owner. When summons is actually served on the right individual by the wrong name, the error becomes immaterial because he has notice of the suit and may appear if he choose and plead a misnomer. But absent actual notice when the law for convenience substitutes a constructive notice, the name of the individual defendant obviously becomes one of the essentials and of the very life of the notice. "Names are like definitions in mathematics, though less exact," says WOODWARD, J., in Jones's Estate, 27 Pa. St. l. c. 338. "The use of names (he continues) is to describe the individual of whom we. speak, so as to distinguish him from all other persons."

(b) There will be found a variety of cases decided by us giving voice to the gravity and significance of accuracy in the use of the Christian name of a defendant where his land is sought to be taken from him through jurisdiction acquired in a suit by constructive notice. Thus, the settled doctrine has come to be that the use of the initials of the Christian name is not sufficiently accurate for such purpose. [Gillingham v. Brown, 187 Mo. 181; Evarts v. Lumber and Mining Co., 193 Mo. l. c. 449 et seq.; Burkham v. Manewal, 195 Mo. l. c. 506 et seq. and cases cited.] The rule is relaxed where estoppel has play—for instance, where the record title was taken by the owner in the initials of his Christian name, and he was served

by such initials. [Elting v. Gould, 96 Mo. l. c. 541.]
There is a case (Mosely v. Reily, 126 Mo. 124), seem-
ingly holding against the general rule, but that case
itself was finally sustained only on the theory of
estoppel. [Turner v. Gregory, 151 Mo. l. c. 106.]
Use of initials in procuring a license to marry and
in being married in accordance with the license was
held to create an estoppel so that a judgment of di-
vorce granted against defendant on publication identi-
fying him by his initials was held valid. [McDermott
v. Gray, 198 Mo. 265.]

There is a line of cases holding that the law recog-
nizes only one Christian name and that some freedom
may be taken with the initial of a middle name.
[Howard v. Brown, 197 Mo. l. c. 46 *et seq.;* Morrison
v. Turnbaugh, 192 Mo. l. c. 445 *et seq.*] But in the last
case the true name of the defendant appeared in the
petition, the affidavit for an order of publication and
the order itself. The trouble arose by clerical slip
in the judgment. In the Howard case, where the de-
fendant's name was Henry *P. P.* Brown and he was
sued as Henry *T.* Brown, significance was given to the
fact that his name was grouped with his mother, his
sisters and his nephews, comprising the immediate
Brown family to which he belonged—thus identifying
him in that way. These cases in nowise militate
against the rule that in notice by publication the de-
fendant should be accurately designated by his true
name.

If the law tolerated slovenliness or pranks in this
regard then slovenliness and pranks might ripen into
a custom and open the door to great mischief. Con-
structive service at best is harsh. It is service not
in substance and fact, but of a sort to which the name
of service is attached from necessity. That method
of service, being highly technical, must be strictly
pursued. Thus it was said in the Turner case, *supra,*
l. c. 103: "Where resort is had to this method, a

substantial, even rigid, observance of the law is required, otherwise the judgment will be void" (citing cases). And in the Morrison case, *supra,* it was held that "constructive service must be viewed critically in order to prevent, so far as can be, irreparable injury." And this rule of strictness was applied in each case directly to the use of the true name of the defendant.

The Turner case has met the approval of this court many times. It is a landmark in the law and establishes the proposition that in constructive service the real record name of the landowner, the name in which he took title (as distinguished from the colloquial name he was known by the neighborhood of the land and to which he answered among those who knew him) should be used in designating him in an order of publication in a tax suit. Turner's record name was Singleton V. Turner. By that name he was designated in the deed by which he took title, his name appearing there no less than four times. Though grantee, he signed that deed by that name. The "V" in his name stood for Vaughn. While a resident of Missouri he lived in Holden, say, fifteen miles from the land. In Holden he was usually called "Vaughn Turner." He went by that name in the neighborhood of the land. He was known as Vaughn from his youth up. When he went to California and took up a residence there, he continued to be called Vaughn. He was sued for taxes as "Vaughn Turner." That name runs through the whole record—petition, order of publication, judgment and deed. In business transactions he usually signed his name "S. V. Turner." It was held that the deed was void and that ruling and the reason underlying it apply vehemently to the case at bar.

(o) We are cited to many cases by counsel for defendant in which the right party has been sued and served with process but in which profert has been

made of some document signed with an abbreviated name or in which it has been urged there was a variance between the proof and allegation arising from misnomer, *etc.* But none of those cases touch the vital point of jurisdiction and due process of law. For instance:

In Fenton v. Perkins, 3 Mo. 24, a question arose whether a certain oral contract called for a note signed by John Mickle. The contention was the contract called for one signed by John McMickle. It was ruled that McMickle might be bound under a note signed as Mickle, but that defendant had no right to impose on plaintiff the risk of proving that Mickle was intended for McMickle. In discussing the case it was held that abbreviations of men's given names are so common that, without any violation of the laws of the land, the courts may take judicial notice of them. It will be seen that the question in that case arose on the sufficiency of the evidence to identify the subject-matter of the contract.

In Weaver v. McElhenon, 13 Mo. 89, the suit was on a note and defendant was sued by his true Christian name, Christopher. But the note was set forth in the petition and it was signed "Christy" or "Christ" McElhenon. The defendant demurred. It was ruled that the defect, if any, could not be reached by demurrer, but by a motion to exclude the note as evidence on account of variance. The court also ruled that the signature to the note was a well known abbreviation of Christopher, and the logic of the ruling was simply that Christopher, if he liked, could dub himself "Christy" or "Christ" and by signing his name that way bind himself on a note when impleaded under the name of Christopher.

In Moseley's Admr. v. Mastin, 37 Ala. 216, an abbreviation, "admr.," was used in the complaint. Exception was taken to that and the court held "admr." meant "administrator."

In Goodell v. Hall, 112 Ga. 1. c. 436, it was ruled that "judicial notice will be taken of the ordinary and commonly used abbreviations and equivalents of Christian names." That language must be read with the case, *viz.*: Eliza M. Hall held title to certain land. She made application under the Georgia statutes to have it set apart as a homestead, signing the application "Elizabeth M. Hall." Subsequently she mortgaged the land as Eliza M. Hall. The mortgage being foreclosed, she made claim that her homestead was not subject to mortgage. This, because her application to have it set apart as a homestead had been sustained. In offering the application in evidence it was objected to because made by "Elizabeth M. Hall." The court ruled that Eliza was an abbreviation of Elizabeth and, if not so, that at least parol evidence was admissible (and was admitted) to show the identity of Elizabeth M. with Eliza M.

In the Jones's Estate, 27 Pa. St. *supra,* a judgment was recovered against Abel Jones. It was entered on the lien docket against "A. Jones." Other judgments were obtained against Jones and entered on the lien docket. The real estate of Abel Jones was sold at sheriff's sale and, on making distribution between judgment creditors, the auditor disallowed the judgment entered on the lien docket in the name of "A. Jones." Proof was made that Abel Jones signed his name in no other way but "A. Jones" and that there was no other Abel or A. Jones in the county. It was ruled on appeal that the object of the docket entry was to give the public notice who was bound and that the entry was sufficient.

In Rupert v. Penner, 35 Neb. 587, the proposition was announced that a deed correctly describing the grantor as Archibald T. Finn, with an acknowledgment designating the grantor as Archibald T. Finn and identifying him as known to the officer to be the person whose name is affixed to the instrument and who ex-

ecuted the same, and which deed was signed "Arch T. Finn," was sufficient to convey the title of Archibald T. The question arose over the admission of the deed in evidence. [See in this connection Houx v. Batteen, 68 Mo. 84.]

McGregor v. Barnabas D. Balch *et al.*, 17 Vt. 1. c. 567, was a *scire facias* upon a recognizance. The defendant pleaded *nul tiel record*. At the trial plaintiff gave in evidence a record of the recognizance in which Balch's Christian name is set forth as "Barney D." Objection was made to this evidence. The court ruled that there was no controversy but that "Barney" and Barnabas are used for the same name and that as defendant was known by the name of "Barney" as well as Barnabas, the objection was properly overruled.

In Sparks v. Sparks, 51 Kan. 195, a question arose on a motion to quash a deposition. The notice to take specified the place as the office of "Dan Ray." The deposition was actually taken at the office of Daniel E. Wray. Wray was identified in the notice as an "attorney at law of Versailles, Missouri." There was no claim made there was any other person of that name or sounding like his in that place, or that the parties were misled. In view of that fact and of the further fact that "Dan" is an abbreviation of Daniel and that Ray and Wray are *idem sonans,* a motion to quash was held properly overruled.

Other cases cited are of a similar character and none go to the point of due process of law or jurisdiction, or in any wise impugn the reasoning of Turner v. Gregory.

(d) We cannot find it ever ruled by any respectable court that "Mike" is a universally known abbreviation of Michael. We are asked to take judicial cognizance that it is a universally recognized equivalent of that name. We decline to do so. It is sometimes used flippantly to designate *any one,* as in the collo-

quialism, "Sure Mike," or in the other, "Are you *Mike?*" or, "You think you're *Mike.*" But this figurative and slangy use is too broad and proves too much.

We are of the notion there is something Celtic about "Mike "—a tang or flavor of the old sod—and that its usage among Teutons is either malapropos, mythical or scant. The name "Michael Ohlmann" is self-evidently German, and we have no call to judicially determine "Mike" as applicable to a nationality not shown to have adopted its use at the fireside as part of the mother tongue.

In this connection it is not without some appreciable weight that there is no evidence tending to show that Ohlmann was known as "Mike" where he lived in Illinois, or in Missouri where his land lay, or that he answered to that name or tolerated such easy familiarity. So far as we can see it is left to the tax officers and circuit court of Reynolds county to be the first to joke or trifle with his name—this, too, when engaged in enforcing tax laws, serving him with summons and solemnly enforcing the State's lien and separating him from the ownership of his estate (no joking matter, withal), and when the records of Reynolds county showed his title was got and held in the name of Michael.

(e) Michael is a baptismal name sacred in meaning and hallowed by sacred legends—witness: Saint Michael, Michaelmas, or the great archangel whose prowess is vouched for in accredited annals of those dim wars seen by the mind's eye of the blind Milton, in which the Great Enemy of Mankind, thrust forth by his sword, pitched headlong flaming, so that (as the record runs):

"From morn
To noon he fell, from noon to dewy eve,
A summer's day; and with the setting sun
Dropp'd from the zenith, like a falling star."

It ill becomes the law, moving with dignity and venerating sacredness, to deal in flippant vein with such a name as Michael, literally in Hebrew, "Who is like God?"

If we were to hold that an order of publication might deal with those abbreviations in names commonly known to all men, yet "Mike" is not an abbreviation of Michael any more than of Micah, Micaiah, Micha, Michah, Michaiah, Michal, or others mentionable. But "Mike" is not an abbreviation at all, accurately speaking. It is to all intents and purposes a mere diminutive, a *nickname*—a corruption. Now, nicknames are in a sense *nicked* names—names that are snipped, whittled off. They are names given in contempt, derision or sportive familiarity—a familiar or opprobrious appellation. [Webster's International Dict., tit. "Nickname."] As such appellations they have no place in those judicial publications of notice by which courts acquire jurisdiction. Otherwise we would have Amelia Jones notified by an order of publication directed to "Sis" Jones; or William Brown under the title of "Bub" or "Bill" or "Buck" Brown; or, if the hypothesis be indulged that the master sculptor and painter were alive and so fortunate as to own real estate in Missouri, he would be brought in under the name of "Mike" Angelo; or Winfield Scott (in like hypothesis) under the name of "Fuss-and-Feathers" or "Hasty-Plate-of-Soup" Scott; or Thomas H. Benton as "Old Bullion" Benton.

But we have pursued the matter far. We think the deed was void because the Reynolds Circuit Court never acquired jurisdiction over Michael Ohlmann. This view of the matter precludes the necessity of considering other questions made.

The judgment is reversed and the cause remanded with directions to enter a judgment in favor of plaintiff adjudging title in him to all the land in his patent. All concur.